[Crim. No. 3571. Second Dist., Div. Three. Nov. 2, 1942.]

THE PEOPLE, Respondent, v. FORREST I. HALL, Appellant.

Maurice A. Gleason for Appellant.

Earl Warren, Attorney General, Bayard Rhone, Deputy Attorney General, John F. Dockweiler, District Attorney, and George H. Johnson, Deputy District Attorney, for Respondent.

SHAW, J. pro tem.—Defendant was charged in count I of the information with grand theft, in count II with forgery and in count III with grand theft. He was found guilty on all three counts, judgment was pronounced against him on each, his motion for a new trial was denied and he appeals.

Defendant was a duly licensed collection agent, doing business at Pasadena, in Los Angeles County, California, and all the charges here made against him grow out of his activities in that capacity. John F. Pryor, a lawyer practicing his profession at Hanford, California, had obtained two judgments

for his clients, one for William J. Hay against Roland S. Frank and W. A. Bliss, hereinafter referred to as the "Hay judgment" and one in behalf of Mrs. Evelyn Bryon and her brother, Thomas Downing, against J. R. Robinson and Nellie Robinson, hereinafter referred to as the "Bryon judgment." Each of these judgments was obtained in the Superior Court of Kings County but all the judgment debtors resided in Los Angeles County. Mr. Pryor, having observed defendant in action and formed a favorable opinion of his ability as a collection agent, induced his clients above named to turn over to defendant for collection the judgments above described. The grand theft charges rest for support upon evidence showing, it is claimed, that species of grand theft from the plaintiffs above named which would formerly have been known as embezzlement of moneys collected by defendant for them, but which is now charged, under section 484 of the Penal Code, as theft.

The charge in count I relates to the Hay judgment. This was obtained in 1932 and its original amount was $1,012. In addition to this award to plaintiff it contained a provision "that defendants recover the washing machine and ironer mentioned and described in the testimony herein." On October 28, 1938, in Mr. Pryor's office at Hanford, an agreement was drawn up and signed by defendant, which was sent or taken to Hay and signed by him also. This agreement referred to the Hay judgment, provided that Hay would assign it to defendant "for collection . . . with the expressed understanding" that Hay would "receive fifty per cent (50%) of all the net proceeds of all collections in the above entitled case when and as collected" and that defendant "agrees to retain John F. Pryor as his attorney in the prosecution of this case." At about the same time Hay executed a written assignment of the judgment to defendant, at the end of which was defendant's signed "consent to have John F. Pryor remain as my attorney in the above entitled cause." On October 28, 1938, at Pryor's office, defendant signed a letter addressed to Pryor referring to the assignment of the Hay judgment, stating that "you [Pryor] are to be retained as attorney in the matter," and that in consideration of the facts that Pryor had obtained the judgment on a contingent basis and had received no fees therefor and that "you [Pryor] are now about to perform additional services," it was agreed that "you and I [Hall]

are to divide equally the fifty per cent (50%) of the net proceeds if and when a collection is made on account of the claim.''

After these papers were signed an execution on the judgment was obtained under section 685, Code of Civil Procedure, and defendant made several calls on Frank, one of the judgment debtors, at Long Beach, and on December 2, 1938, entered into a written agreement with him regarding the judgment, by the terms of which defendant was to receive from Frank ''$400 cash this date,'' an assignment of a trust deed for $392, and an assignment of a contract with one Fernandez for sale of three lots with a balance due of ''about'' $800, and Frank was to cooperate in the collection of ''the balance of the judgment.'' At the time this agreement was signed Frank paid defendant the sum of $400 and assigned to Minnie M. Hall, defendant's mother, as security, the contract for sale to Fernandez of the three lots above mentioned, and the trust deed. On February 10, 1939, Frank paid defendant another $100 on the Hay judgment. On January 7, 1939, Frank assigned to defendant a contract with one Cotton for the sale of two other lots in the same tract with, and near, the three lots covered by the Fernandez contract. The latter transaction, as stated by Frank, was one by which defendant agreed to clear up the title to the two lots, defendant was to have a half interest in them for doing so and Frank was to have the other half, the deal being ''independent of the judgment''; but later Frank made an agreement with defendant by which defendant took Frank's interest in the two lots ''in on the judgment,'' and gave Frank credit for the balance due on the Hay judgment, ''which was about $100.'' This was in February, 1939. Under date of February 17, 1939, Frank made an absolute deed of the lots covered by the Fernandez contract to defendant's mother, Minnie M. Hall. Under date of March 18, 1939, defendant signed an agreement with Frank stating that defendant ''does hereby release'' to Frank all defendant's interest in the trust deed above mentioned, and that in consideration of ''the release'' by Frank to defendant and his mother of all interest in the five lots above referred to and the cash already paid to defendant, defendant ''does hereby release and forever settle the obligation of the judgment.''

As above stated, in the course of collecting the Hay judgment the defendant obtained from Frank on December 2, 1938, $400 and on February 10, 1939, $100. By the agreement he made with Hay he was required to remit to Hay half of the net proceeds "when and as collected." Defendant testified that he had incurred an expense of $35 for making title search and $20 for other information. He did not report these expenses or claim them as deductions, but if they were deductible items, there would be a balance of $445 as net proceeds. No other items of expense appear up to this time. On December 14, 1938, defendant sent Hay $50, in a letter which stated that "From Frank I received $100," and also mentioned the assignment of the trust deed and a "lien on a house" not definitely described, but apparently the above mentioned contract with Cotton, and then declared, "This is about all I can get Frank to agree to." At the same time defendant paid Pryor $25. On February 17, 1939, defendant sent Hay $14 and on January 29, 1939 he sent Pryor $7. No further sums were sent by him to either of them.

█ Thus it appears that when defendant received $400 he accounted for only $100 of it, and that on collecting $100 more he accounted for only $28 of it. The excuses he gave at the trial for not making a complete accounting are that he had not made a complete settlement with Frank, and that in January, 1939, and thereafter, Frank was making claim for the washing machine and ironer which, by the terms of the Hay judgment, were to be returned to him, that defendant, as assignee of the judgment was liable to perform this part of the judgment, and that hence he was entitled to retain the balance of the sums collected as a protection against this liability. Neither of these excuses is good. By the agreement between defendant and Hay defendant was required to remit to Hay half of the net proceeds of all collections on the judgment "when and as collected." The fact that the settlement with Frank was not complete would not afford any reason for not remitting to Hay his share of the proceeds of a partial settlement. Moreover, by the agreement of March 18, 1939, which was signed by Frank, as well as defendant, defendant purported to "forever settle" the judgment, so even on his theory on this point he should have remitted then.

In his own testimony defendant says that Frank was claiming $200 to $300 as damages if he did not receive the

washing machine and the ironer. It appears that later, after this prosecution of defendant was begun, Hay settled this matter with Frank for $25. Frank testified that defendant first called his attention to the fact that he was entitled to these articles, and he, Frank, did not make demand on defendant for them before the judgment was settled. Moreover, the agreement of March 18, 1939, ''forever'' settling the judgment, which Frank signed, would relieve defendant from any liability on this account from that date. Under these circumstances the jury might well conclude that this matter afforded no justification for not remitting the proceeds of the collections.

██ No demand was made by Hay for his share of the amount collected by defendant until more than two years after the last of these collections; in fact Hay testified that he did not know of any collections other than those on which defendant reported to him until about the time of demand. Defendant contends that no sufficient demand was made even then. ''No doubt embezzlement may be established, under certain circumstances, without proof of a demand, as where other evidence clearly shows an appropriation by an employee of his employer's funds, with intent to do so fraudulently and feloniously,'' said the Supreme Court in *People* v. *Royce*, (1895) 106 Cal. 173, 177, 178 [37 P. 630, 39 P. 524], and the court quoted this statement with approval in *People* v. *Hatch*, (1912) 163 Cal. 368, 373 [125 P. 907], adding to it this: ''In some cases, in the absence of other sufficient proof, a demand may be necessary to fix the fact of the fraudulent appropriation; but the real test always is, does the whole evidence establish the crime charged, that is, a fraudulent appropriation as charged in the indictment.'' To the same effect see *People* v. *Hill*, (1934) 2 Cal.App.2d 141, 157 [37 P.2d 849]. In *People* v. *Wyman*, (1894) 102 Cal. 552, 557 [36 P. 932], it is suggested that no demand would be necessary where, under the terms of a defendant's employment, the time for payment of money of his employer in his hands had arrrived and there was no satisfactory explanation of his default. This suggestion fits the present case. Not only did the defendant fail, without satisfactory explanation, to remit the full amount required when he collected $400 and then $100 for Hay, but he gave Hay misleading information, telling him that $100, instead of $400, had been received on the first collection, omitting to

mention the assignment of the Fernandez contract, which he had received and declaring that "this is about all I can get Frank to agree to." The defendant's explanation at the trial of what he later did with the money not accounted for shows that, nearly a year after receipt of the $400, he expended it for improvements and repairs on the two lots above mentioned which he obtained from Frank and in which he claimed a half interest as his own property. By so doing he converted at least half of the money so expended to his own use, if he had not previously done so, without regard to any question of his right to expend money collected for Hay in improving Hay's property without the latter's knowledge or consent. These and the other circumstances already set forth are sufficient to support the jury's implied finding that defendant fraudulently appropriated property of Hay which came into his possession.

The further proceedings of the defendant in collecting the Hay judgment are so interwoven with those relating to the forgery charged in count II, that the facts regarding both must be included in one statement. As already stated, Frank made a deed dated February 17, 1939, of the three lots covered by the Fernandez contract. Frank testified that he signed this deed at or about its date, and that Minnie M. Hall was then named in it as grantee. Defendant testified that no grantee was named in the deed when Frank signed it and delivered it to him, that this occurred in December, 1938, that later in December, Frank orally consented to the insertion of the name of Minnie M. Hall as grantee and that her name was then put in. When this deed was introduced in evidence at the trial the grantee named in it was Trinidad Yebras. Frank testified that he did not authorize this change or discuss it with defendant and did not know of it until the investigation leading to this prosecution was begun. Defendant testified that he caused the erasure of the name, Minnie M. Hall, to be made on or about February 17, 1939, and, about a year later, himself inserted the name, Trinidad Yebras, as grantee, that this was done with Frank's oral consent and that Frank on being later told of it, said it was "all right." The evidence shows further that Fernandez made payments to defendant on his contract, the amount conceded by defendant being $131 and interest in unspecified amount, and the amount according to Fernandez' son being at least $15 per month for at

least eighteen months, or $270. Trinidad Yebras was a friend of Fernandez and in November, 1940, bought from defendant the lots covered by the Fernandez contract, and paid him $598 therefor, not knowing at the time of any defect in the title, and thereupon he received from defendant the deed above mentioned with his name in it as grantee. He did this for the benefit of Fernandez. On July 30, 1941, thirty days after the information herein was filed, Yebras began an action to quiet title to the property against Frank and others and later a default judgment was given in his favor against Frank. On March 8, 1941, Pryor wrote and sent to defendant a letter demanding an accounting of his collections for Hay and the date of this letter is the date charged in the information as that of the theft from Hay. In answer to this defendant went to Pryor's office with a large and apparently unsorted mass of papers at which Pryor refused to look, but defendant did not pay over to Hay or Pryor any money.

The reasons now assigned by defendant for not paying over to Hay any of the money received from Fernandez and Yebras are first, the unsettled claim of Frank for the washing machine and ironer, already discussed and held insufficient, second, Yebras' action to quiet title, and third that defendant expended more than the sums so received on the real property obtained from Frank. Since Yebras' action to quiet title was not begun until after this prosecution was commenced, it affords no valid reason why defendant should not have accounted for the money received from Yebras at the time of its receipt. The money defendant claims to have spent was, according to his testimony, all spent on the two lots in which he claimed a half interest under his deal with Frank. The total amount so spent was only $361.40, of which, at most, he could claim against Hay only one-half. Such a claim could afford no good excuse for not paying to Hay his share of the considerable excess over that amount which defendant had collected from Fernandez and Yebras. As to these matters also we cannot say there is no support for the jury's finding of fraudulent misappropriation.

Coming to the forgery charge, we think the evidence above recited is ample to support the jury's verdict. From it the jury could find that after Frank had signed the deed and delivered it to defendant the latter, without Frank's knowledge or consent, changed the name of the grantee and used the

deed so altered as a means of obtaining payment from Yebras for the property then appearing to be conveyed to him by it. A deed so altered is, of course, void and ineffective as a conveyance to the person whose name is so inserted as grantee. This is sufficient to satisfy the provision of section 470 of the Penal Code that "Every person who, with intent to defraud . . . falsely makes, alters, forges or counterfeits, any . . . deed . . . is guilty of forgery." Defendant cites against this conclusion *Dutton* v. *Locke-Paddon,* (1918) 37 Cal.App. 693, 695 [174 P. 674], and *Riverside P. C. Co.* v. *Maryland C. Co.,* (1920) 46 Cal.App. 87 [189 P. 808], but neither case is in point here. In the Dutton case it was held that a change in the name of the grantee of a deed, made with the grantor's consent, after it had been signed but before it had been delivered as a deed, by one who was the real but not the record owner of the property conveyed, was "not the alteration of an instrument, since the instrument had not yet been created" and for that reason did not make the deed void. Here, according to testimony which the jury believed, the deed had been delivered as an effective conveyance and the grantor was not consulted about the change. The other case cited by defendant did not involve an alteration but related to a bond delivered with unfilled blanks, the rule on which is different from that applicable to deeds in like condition stated in the cases hereinafter cited.

 In connection with the forgery charge defendant complains of the following instructions given.

"No 25. Under the law of this state a deed to real property must be made in writing, and, therefore, any authority given to an agent to change or alter such deed must also be in writing. If, however, an alteration is made by an agent having authority in writing from the grantor named in the deed to make such alteration the making thereof by the agent would not be a forgery."

"No 26. Under the law of California a deed to real property must state the name of the grantor and the name of the grantee. A deed which does not show the name of the grantee (unless there is written permission given by the grantor for the name of the grantee to be subsequently inserted) is void and carries no title to the property described."

"No 27. The law of this state is that the name of a grantor or grantee in a deed cannot be inserted by an agent for the grantor in the absence of the grantor, unless

the agent's authority be in writing. If the authority of the agent is not in writing, his insertion of the name of the grantor or grantee does not convey any title and the deed is therefore, absolutely void.''

These instructions correctly stated the law, as far as they went. (See *Trout* v. *Taylor*, (1934) 220 Cal. 652, 655, 656 [32 P.2d 968], and authorities there cited; also *Bryce* v. *O'Brien*, (1936) 5 Cal.2d 615 [55 P.2d 488], approving *Trout* v. *Taylor*.) ██ But it is also the law, as declared in *Trout* v. *Taylor, supra,* that ''An innocent purchaser taking a void instrument can, however, find protection in the doctrine of estoppel, where circumstances are presented which establish negligence or some other misconduct by the other party, which contributed to the loss.'' This rule should have been stated to the jury, with a fuller explanation of the doctrine of estoppel, as a qualification of, or in addition to, the instructions above quoted. The testimony of defendant states facts which would raise such an estoppel against Frank in Yebras' favor. It shows that Frank orally consented to the insertion of Yebras' name in the deed as grantee, with knowledge that defendant intended then to deliver the deed to Yebras for the purpose of effecting a conveyance of the property to him. While Yebras was not directly informed of this conduct of Frank, the delivery of the deed to him with his name appearing therein as grantee, such delivery being with Frank's consent, was an implied representation that Frank as grantor had executed such a deed, and entitled Yebras to rely, as against Frank, on the latter's conduct above described as creating an estoppel. In the cases of *Trout* v. *Taylor, supra,* and *Bryce* v. *O'Brien, supra,* it was held that findings of no estoppel were supported by the evidence, but the facts were quite different from those to be considered here. In the Trout case the grantor, who was defrauded in other ways, merely failed to notice that the name of the grantee was not inserted in her deed. In the Bryce case, the grantor was induced to sign a deed without inserting the grantee's name in order to facilitate its exchange for certain bonds. In neither case was a deed altered by the insertion of a grantee's name with knowledge on the grantor's part that it would then be delivered to such grantee as a conveyance.

An intent to defraud is essential to the crime of forgery, as the jury were properly instructed. If the jury had been

properly instructed on this rule of estoppel, they could, if they believed defendant's testimony above stated, have found that he had no intent to defraud Yebras, but believed that the deed would be an effective conveyance of the land to him. Without such an instruction on the law of estoppel, the other instructions quoted would prevent them from reaching such a conclusion even though they believed defendant's testimony on this point.

Count III grows out of defendant's dealings with the Bryon judgment, which was dated April 29, 1935. This was an ordinary money judgment in the sum of $1,344. This judgment was assigned to defendant or or about February 8, 1939, and on February 9, 1939, an agreement regarding it was made between Mrs. Bryon, Downing and defendant. This agreement, after reciting the assignment, provided that defendant "agrees to use his best endeavor to collect said judgment, which he is hereby authorized to do" and that in consideration of his services "all moneys collected on said judgment after paying the cost and expense in the premises shall belong" half to Downing and Mrs. Bryon and half to defendant and that "immediately upon making collection of such sum as he may be able to collect on said judgment" defendant will "after deducting the necessary cost and expense in the premises, remit to the First Parties [Mrs. Bryon and Downing] one-half of such net proceeds." The agreement also authorized defendant "to use his own judgment" in compromising the debt, but not for less than $500. After signing these papers Downing left the handling of the matter to his sister, Mrs. Bryon. An execution was issued on this judgment, which defendant caused to be levied on real property at 3920 South Broadway, Los Angeles, hereinafter referred to as the "Broadway property." Defendant bid this property in at the sale in the name of Mrs. Bryon on March 13, 1939, for $500. It was deeded to her by the sheriff August 13, 1940. After deducting expenses, $454.45 was credited on the judgment. On March 13, 1939, the defendant also had the execution levied on Title Guarantee & Trust Co. and thereby impounded $1,218.37 which it had in its possession for payment to the judgment debtors. On April 2, 1940, the money so impounded was finally paid over to defendant. He also received as rent of the Broadway property, in 1939, $260, and in 1940, $360, making his total collections in money, $1,838.37.

None of this was ever remitted or definitely accounted for to Downing or Mrs. Bryon or anyone for them.

One of· the defenses now advanced to count III is that by an agreement defendant made with Mrs. Bryon after the Bryon judgment was turned over to him for collection he sold to her an interest in some real property referred to in the record as the "Kalmia Street property" in exchange for the judgment, thereby becoming the absolute owner of the judgment, and therefore he was not required to turn over its proceeds to her. The difficulty with this argument is that, while defendant testified that such an agreement was orally made, Mrs. Bryon positively denied it, and the jury's obvious acceptance of her testimony is binding upon us.

The only other excuse given here for defendant's prolonged failure to pay anything to Mrs. Bryon or her brother, out of the $1,800 and more that he received on account of the judgment is that he expended, for attorney's fees and court costs in collecting the judgment, more than he received. These expenditures were in part testified to by defendant, and as to some of them he was corroborated by attorneys who represented him in various suits. Some of these expenses related to the Kalmia Street property and we cannot credit them to defendant because of the jury's finding that Mrs. Bryon had no interest in that property. It appears without dispute that defendant brought many actions in the municipal and superior courts, in connection with his efforts to collect on the Bryon judgment. The nature and purpose of some of those actions appear rather indistinctly in the record; indeed, as to several of them, we cannot determine whether defendant had any good reason for bringing them or not. At least, he lost some of them. The jury may have been in the same situation as we are, and have concluded that defendant had no just reason for deducting from his collections the expenses of some of these actions. But the total of all the expenses which he claimed in all of these actions, including attorney fees not paid but incurred, in some of them, appears to be only $985.57. There may be some other unpaid attorney fees, but the record before us does not enable us to determine the amount thereof. The jury may have concluded that the expenses which defendant could claim in good faith were not sufficient to relieve him from the necessity of paying $200 or more to Mrs. Bryon. They may also have considered his good faith impugned by

356

what they deemed his false explanation of his reason for not doing so—that is, his claim of a purchase of the judgment from her. We cannot say that such conclusions are without substantial evidentiary support in the record.

The same objection to the evidence regarding a demand is raised on this count as in case of count I. The same rule must be applied. The evidence is sufficient to show an embezzlement even though there had been no demand.

 At the trial John F. Pryor was called as a witness by the prosecution. Before his testimony had proceeded far, defendant objected "to any testimony by this witness on the ground it is privileged and confidential between an attorney and a client," and it was stipulated that "any questions asked of this witness may be considered objected to upon the ground it is a confidential communication between attorney and client and privileged." Defendant now argues that the court erred in overruling this objection. The argument is based on the above mentioned papers signed by defendant in connection with the Hay judgment, by which defendant appears to have retained Pryor as his attorney in the matter of collecting that judgment. Pryor denied that he had ever acted as attorney for defendant, but we need not determine whether this testimony overcomes the showing made by the papers referred to. No such arrangement was made regarding the Bryon judgment, and hence the objection could not be good as to matters relating only to it. The argument here seems to assume that every communication between attorney and client is privileged. This is not the law. To be privileged "the communication must be confidential, and so regarded, at least by the client, at the time. If it clearly appears that the same was not intended by the client to have been confidential, it is not privileged." (*Mission Film Corp.* v. *Chadwick P. Corp.*, (1929) 207 Cal. 386, 390 [278 P. 855].) Communications made in the presence of a third party who is present as a witness are not privileged. (*Mitchell* v. *Towne*, (1939) 31 Cal.App.2d 259, 265 [87 P.2d 908].) We find in Pryor's testimony nothing that can be regarded as privileged under these rules. Much of it related to the Bryon judgment and was not subject to the objection. He testified that he and defendant did *not* say various things to each other and that he, Pryor, did not know of certain of defendant's acts. Obviously, these are not communications, at all, but the suggested communications are such that, if made, they would necessarily have been in-

tended for Hay's information, and so not confidential under the rule above stated. The letter of Pryor demanding an accounting of defendant's collections for Hay and Bryon and a later letter repeating the demand and suggesting payment to them on account, purported to have been written by Pryor in behalf of Hay and Bryon, and could not be regarded as a confidential communication between him and defendant, even if he were attorney for defendant as well as Hay and Bryon. Pryor produced and identified a letter from defendant and Pryor's answer to it, but this letter from defendant was addressed to both Hay and Pryor. Pryor also testified to a conversation he had with defendant after the letter Pryor wrote to defendant demanding an accounting; but defendant brought a witness with him to this conversation. We find no error in the ruling complained of.

The judgments and the order denying a new trial are affirmed as to counts I and III; they are reversed as to count II with directions for a new trial on count II.

Shinn, Acting P. J., and Wood (Parker), J., concurred.