### SARTHOU v. CLARK.
### Civ. No. 408–ND.

District Court, S. D. California, N. D.
June 2, 1948.

W. H. Wadsworth, of Los Angeles, Cal., for plaintiff.

James M. Carter, U. S. Atty., Ronald Walker, Asst. U. S. Atty., and Clyde C. Downing, Asst. U. S. Atty., all of Los Angeles, Cal., for defendant.

McCORMICK, District Judge.

This is a suit in equity brought under the authority of Section 9 of the Trading with the Enemy Act, as amended, hereinafter called the Act. 50 U.S.C.A.Appendix, § 189 et seq. The plaintiff predicates his claim specifically under Subsection (d) of Section 9 of the Act.

As a result of pretrial under Rule 16, Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, many of the initial questions projected by the pleadings have been determined, as will appear from the pretrial order entered herein May 21, 1947, to which reference should be made for further details.

Plaintiff is the executor of the Last Will and Testament of Paul von Neindorff, deceased. The Will is holographic. It was executed at Budapest, Hungary, where von Neindorff was temporarily living on June 11, 1941. The Will has been duly admitted to probate under applicable laws of the State of California, in the Superior Court of the County of Tulare in such State.

The relief that is sought herein by the plaintiff as executor is the return to him for administration of two citrus-producing ranches situate in Tulare County, California, and other property, all of which is devised by von Neindorff in the Will of June 11, 1941. At present the ranches and the other property involved are vested in the Alien Property Custodian by seizures under vesting order Number 2841, executed December 1, 1943, and supplemental vesting order Number 3774, issued June 7, 1944.

The case presents peculiar activities and attitudes of Paul von Neindorff, the central personality under scrutiny, during his presence in Europe from about the middle of the year 1939 to his death there on November 15, 1944, at a hospital at Salzburg, to which he had been removed about one week before from a concentration camp at Laufen, Germany.

Paul von Neindorff was born of German parents at St. Legier, Switzerland, on January 30, 1870. His father was a military commandant at Graudenz, a town in West Prussia, and his paternal grandfather was Commanding General of the Prussian Artillery. As a boy of ten Paul von Neindorff entered the Cadet Institute in Bensberg, later going to a cadet institute at Potsdam. He came to America in 1887, and lived in the United States after that time except when periodically visiting Europe, and toward the latter part of his life he went there yearly. He was a citizen of the United States through naturalization on June 2, 1896. He was married, and with his wife Margaret, who was ill and bedridden at the time, he went to Wiesbaden, Germany in 1939. Leaving Mrs. von Neindorff in the care of a nurse, Auguste Suess, at Wiesbaden, he came to California in 1940, and after staying in the United States about six months, returned to Wiesbaden in October, 1940. Through one Staab he contacted Heinz Jennewein, at that time in charge of Military District XII of Secret Intelligence Service of the German Army at Wiesbaden. After investigation, in the fall of 1940, von Neindorff accepted employment in such activity, and having been given an undercover name, "Narcisse," was assigned missions in various countries in Europe outside of Germany in counter intelligence work for the German Army. These he indisputably completed at different times in the year 1941, at least up to the entry of the United States into the war in December, 1941, and while there is much evidence, both documentary and by oral testimony, that he continued such undercover counter espionage in January, 1942, the central problem before us is as to the probability of such activities under all of the evidence before the court.

Von Neindorff remained in Wiesbaden upon completion of his counter espionage work until his arrest by German authorities in July, 1942, and after that time until his death he was a prisoner for offenses against the German government of which he was convicted in courts of the Nazi regime.

There are some inscrutable situations and conflicting characteristics shown by the record before us relating to this odd individual, and the problem of judicially determining the legal status of Paul von Neindorff under the provisions of the Trading with the Enemy Act is not without its difficulties. However, by keeping clearly in mind the restrictions on the legal right to successfully sue the United States that are expressly provided for in Section 9 and the concomitant definitions of status contained in Section 2 of the Act, we have been unable under the record before us to conclude that the plaintiff-executor has sustained the burden of proving that Paul von Neindorff was not an

"enemy" or "ally of enemy" at the time of and after the entry of the United States in the war against Nazi Germany. Cf. Clark v. Uebersee Finanz-Korporation, 332 U.S. 480, 68 S.Ct. 174. And while the ultimate crucial issue in this case is whether Paul von Neindorff was an "enemy" or "ally of an enemy" of the United States as defined in Section 2, subdivisions (a) and (b) of the Act, to decide such issue the court must from the preponderance of the evidence consider and answer two subsidiary questions: (1) Was Paul von Neindorff a resident of Germany during World War II, as the term "resident" is used in the Act and as it has been interpreted by the courts?; and (2) Was Paul von Neindorff an officer, official or agent of the government of any nation with which the United States was at war during the period from December 11, 1941 to November 15, 1944, the date of his death?

We think "resident within the territory" as employed in the Act connotes something different from and more than living within the specified areas. It is rather indicative of a settled and permanent place of abode, volitionally acquired and voluntarily assumed. It is a habitation having domiciliary properties. Josephberg v. Markham, 2 Cir., 1945, 152 F.2d 644; Vowinckel v. First Federal Trust Co. et al., 9 Cir., 1926, 10 F.2d 19; Stadtmuller v. Miller, 2 Cir., 1926, 11 F.2d 732, 45 A.L.R. 895.

Measured by such standards, Von Neindorff in the light of the factual situation shown by the record before us cannot be held to have at any time manifested a clear intention to change his domicile from California to Europe. His migratory and visitor habits of spending several months of each year in Europe began about 1923 and were consistently terminated and concluded throughout his life by regularly returning to California and devoting his attention to and living near his Tulare County properties, whereon he and his wife had established their home early in 1930. Even after his final visit to Germany, which began in 1939, he returned to Tulare County in 1940 to look after his affairs, and while there he evinced what may be characterized as a most forceful expression of his intention to retain a domicile in California by registering as a voter and stating his residence as Number 563 Monroe Avenue, Porterville, Tulare County, California,—a place which he had made his home with Mr. Sarthou, the plaintiff herein, since 1937.

The transitory movements and acquisition of housing facilities in Europe, while material for considering his residential status under the Act, cannot be said to outweigh the uniform and positive classification of himself as residing in Porterville, California, in formal instruments and documents pertaining to himself, his activities and his property interests in Germany and in California.

When all the evidence, including the decree of the State court admitting the Will of November 11, 1941, to probate in Tulare County, California, is considered, it is clear that Paul von Neindorff was not a resident of Germany within the meaning of the Act under consideration in this case, and the court so finds.

We turn to consider subsidiary question (2), which is, concretely: Was Paul von Neindorff an officer, official or agent of the government of Germany at any time between December 11, 1941, the date of the Axis declaration of war against the United States, and November 15, 1944, the date of the death of Paul von Neindorff?

Primarily, we have for decision rulings on the admissibility of certain writings of Paul von Neindorff intended apparently for but never actually delivered to his attorney. It is contended by plaintiff-executor that such writings should be excluded as confidential communications between attorney and client. We think it not clear that the questioned writings were regarded by von Neindorff as confidential, and such essential factor being of doubtful existence, exclusion from consideration by the court in this action is not warranted. Exhibits BB and BB-1 and Z and Z-1 are therefore admitted in evidence. See Mission Film Corp. v. Chadwick Pictures Corp., 207 Cal. 386, 278 P. 855; People v. Hall, 55 Cal.App.2d 343, 130 P.2d 733.

One other document, defendant's Exhibit DD and its English translation Exhibit DD-1 are also objected to by the plaintiff. This exhibit is a certified copy of an opinion and decision of the Special Court for the District of the Superior State Court at Frankfort on the Main in a criminal case against von Neindorff in such court at a session of June 5, 1944, at Wiesbaden, Germany. The purpose of the offer was stated to be to identify the German court, its members, the charges against von Neindorff and the outcome of a second criminal proceeding against him in June, 1944. Inasmuch as there is other evidence in the record reflecting such matters sufficiently, we regard the proffered document as far as relevant to be merely cumulative and surplusage, and plaintiff's objections to Exhibit DD and DD-1 are sustained.

We have earlier in this memorandum alluded to the mysterious attitude of Paul von Neindorff and to the machinations of the Hitler regime in dealing with him from July, 1942, to his death in November, 1944. This court has been unable after a very careful and extended consideration of the record to judicially appraise many of such peculiar and unusual matters from normal bases. There are, however, clearly established and credible factors in the record before us that clearly justify the conclusion that Paul von Neindorff after the entry of the United States into World War II was an officer, official or agent of the government of Germany, and such conclusion therefore, under the terms of the Act, requires dismissal of the executor's claim in this action, without prejudice, however, to any other applicable executive or administrative relief under the Act.

Aside and apart from the testimony of the German alien witnesses Suess, Jennewein and Thoresen produced by the Government at the trial, the memorials in the form of letters written by von Neindorff himself indisputably show him to have expressed loyalty to Hitler and in sympathy with his racialism philosophy. During his imprisonment by the Nazis, which began in July, 1942, on alleged charges of indiscreet disclosures and continual malicious utterances against the German government and its leaders, he wrote boastfully and fervently of his attachment to the "Reich" and to the "Fuhrer." Three of such writings so thoroughly reflect the attitude and sentiment of von Neindorff even after the United States entered the war, and also show such equivocal statements of his activities in 1942 that it is appropriate to quote these sustained disclosures of Nazi principles. Under date of October 27, 1942, he stated: "My conduct as regards the Fuhrer and the Reich is such that I could never be accused of treason!—And I believe that you personally are now of the same opinion, and anyone else to whom this case is presented accurately, in accordance with the truth.—Further, it is true that during my absence, after my return from Portugal, this Frau Ransenberg lived in the same house, and then while our Gusti (also?) was on a trip, stole letters from my desk, locked or not, because a couple (of them) were found in her possession. It would be all the same to the Ransenbergs whether my sitting room or desk was locked or not, because they would find ways of opening doors or desks.—From January 1941 to the beginning of December 1941 I was doing things for Branch XII, I took trips to France, Spain, Portugal, and twice to the Balkans. I did not solicit this post, but was asked to make these trips, because I was an American citizen, had an Am. passport and much foreign exchange, and I know languages and am an experienced traveler. In spite of my advanced age of 72, in spite of the pleas of my very sick wife, I made these trips, received 700 R.M. (Reichmarks) for it, and a letter of thanks from Capt. Jennewein (?) for the good reports for the Wehrmacht. My expenditures for these trips were about 1500 dollars, and on my return I found my wife in the morgue, dead.* (Translator's note: There does not seem to be any footnote to elucidate this asterisk). Now I have been in prison over 3 months and I am in poor health. Could you not let me go home and let me have my freedom, please. Since America entered the war I have no longer done anything for Branch XII."

Again, about eight months later, he wrote: "On March 15, 1940, I went to

America came to Wiesbaden in October 1940; shortly after that, in November, I was called upon to make important trips abroad for the Reich! On March 10, 1941, I returned from one of my trips abroad, and on March 11 my wife was buried in Wiesbaden.—In 1940 I bought a villa from Jews in Wiesbaden, with the approval of the city of Wiesbaden!—I then wished to return to California, but was again called upon to make trips abroad for the Reich. These further trips took about 6 months. Now since the U.S.A. entered the war I was no longer active for the Reich! Shortly before I started on these trips, I told my wife and a couple of other persons I knew, that I was going to make trips for the Reich.—"That is the misdeed that I did." and was charged with "alleged treason" and sentenced to a year in prison; of the eleven months that I had to spend in detention awaiting prosecution, I was allowed 8 months! And I must now remain here in prison until Oct. 25th. I committed this offense unwittingly, and I have never had the intention of harming the Reich!—I have never incurred the penalty of the law!—I paid for all those trips with my own money; with the exception of 720 R.M. I received a nice letter of commendation. I am over 73 years of age and my health has suffered greatly since the many months that I had to spend in prison.—I have done much good for Germany in the U.S.A. and am ready to continue to do good for Germany."

Then about nine months thereafter he again wrote: "1) From H(err) Werlin's letter in March or April 42, in which he called upon me to go to Portug(al) again (red) to attend to important matters for the Wehrmacht (armed forces), it is clearly seen how v.N. feels toward Werl(in), Reich and Fuhrer, in spite of the fact that the USA was at that time already in the war, and I, as a USA citizen, ran the risk of losing my entire fortune in the USA!—2) In 1941 the Wehrmacht demanded that he travel in Portugal, he did this gratis, and for (the sake of) his valuable reports from Portugal he saw himself obliged to get an extension in Portugal of his USA passport (which had expired) in order to get from Portugal to D (Deutschland, or Germany), to submit reports. I received a letter of commendation and 720 RM for this undertaking from the Wehrmacht, you too know this letter of commendation. He showed the extension in his USA passport to the Wehrmacht, and also to the Foreign Office in Berlin and the US Consul General in Frankfurt am Main, as well as in Munich. Therefore it is not a fact that the Gestapo accused him of falsifying passports. Later the Wehrmacht again called upon him to travel to the Balkan countries in his passport. For 8 months activity I spent more than $1500 and 1200 RM and received nothing."

Without further comment on the many peculiar written statements of Paul von Neindorff that are in evidence, if there were nothing before the court but the contradictory writings of von Neindorff, the security of a finding of his identification with the Nazi regime as a counter-intelligence agent after December 11, 1941 would be questionable, but we think that the candid and convincing character of the testimony of Witness Jennewein leaves no reason to doubt the justification for such a finding in the light of other corroborating factors in the case.

Whatever may be asserted under the evidence against the fairness, impartiality and credibility of either the witnesses Auguste Suess or Ingewald Thoresen, such contentions can have no application under the record before us as to the witness Heinz Jennewein. This witness, now a German business man, was during the war an officer in the German army, and as such was in charge of an office of counter-intelligence, Branch XII in Wiesbaden. He was the immediate superior in mission work of a confidential character that Von Neindorff, according to his admissions in evidence, performed in various countries of Europe for the German army in the year 1941. It was from officer Jennewein that Von Neindorff accepted employment as a Nazi agent. He made the assignments to von Neindorff and received reports from him of the missions completed by him in Portugal, Spain and the Balkans in 1941. That von Neindorff was paid by Jennewein on his return from one of

the missions is indisputably proven. His testimony as to these counter-espionage assignments corresponds substantially with von Neindorff's writings that are in evidence. He was positive and unequivocal that he had assigned von Neindorff to a mission to Paris and that von Neindorff had completed it, returned and reported to him concerning it in January, 1942. The only discrepancy between his testimony on the point of von Neindorff's espionage activities after the entry of the United States into the war and the writings of von Neindorff relating thereto lies in the designation of the locale in Europe to which von Neindorff went to the mission, and not at all of the fact of the mission's occurring in the year 1942. The witness Jennewein, as we have noted, testified that von Neindorff went to Paris, while the von Neindorff writing states that he went to Portugal. There is no conflict or contradiction whatever between them as to the existence of an espionage mission by von Neindorff in the year 1942. There has been no showing whatever that lends any support to the argument that the witness Jennewein was unfriendly to von Neindorff at any time or that he was prejudiced or had any interest adverse to the plaintiff, or to any of the beneficiaries of the estate of von Neindorff, and the mere fact that he appeared as a witness furnishes no grounds whatever to disregard or reject his testimony in this case.

Our decision in this case rests entirely upon what we think is an irresistible conclusion under the record before this court, namely, that Paul von Neindorff was an "enemy" and "ally of enemy" under the Trading with the Enemy Act, as amended, by reason of having acted as an agent of the German government after that government and the United States were at war. Under no other theory or basis can the plaintiff-executor under the evidence be barred in this suit from the remedial provision of Section 9 of the Act.

■ It is undoubtedly true, as urged in the brief of the defendant, that Congress in the First War Powers Act of 1941, 55 Stat. 839, 50 U.S.C.A.Appendix, § 601 et seq., granted the President the power to vest in an agency designated by him "any property or interest of any foreign country or national thereof," (Clark v. Uebersee Finanz-Korporation, supra), and therein authorized the President to prescribe rules and regulations which he deemed necessary to carry out the purposes and objectives of the Act. But in testing the scope and effectiveness of Executive Orders promulgated under the Act which restrict or enlarge statutory terms employed by Congress in national legislation, care must be taken to make secure to "any person, not an enemy, or ally of enemy," as such categories are specified in the Act, the right to reclaim his property or to have just "compensation" for it under the protection of the Fifth Amendment to the Constitution of the United States. See Josephberg v. Markham, supra, and Silesian-American Corporation v. Markham, 2 Cir., 1946, 156 F.2d 793.

■ We understand the defendant to contend under his separate defense to the complaint that regardless of his "residence" or "enemy" taint, von Neindorff, a citizen of the United States, became a "national" of Germany under Executive Order No. 9095, as amended, 50 U.S.C.A.Appendix, § 6 note, because he occupied a dwelling place in Germany during the time that a state of war existed between that nation and the United States and that by reason of such situation, exclusive of any other statutory factor, von Neindorff is classified as an "enemy" as to whom no right of suit is provided under Section 9 of the Act. We do not believe that such a narrow concept of the right to sue explicitly granted by Section 9(a) is warranted by the purposes and objectives of the Act or by any other Congressional Act. See Clark v. Uebersee Finanz-Korporation, supra, and Silesian-American Corporation v. Markham, supra.

■■ We conclude by holding that Paul von Neindorff was neither a "resident" nor a "national" of Germany within the meaning of the Trading with the Enemy Act, as amended. We hold, however, that Paul von Neindorff under the record before this court was an agent of the German government on and after December 11, 1941, and during such period was an "enemy" and "ally of enemy" within the meaning of the Trading with the Enemy Act, as amended.

Accordingly, findings of fact, conclusions of law and judgment of dismissal of the action on the merits under issues of the complaint and answer are ordered for defendant without costs.

Attorneys for defendant will prepare, serve and present same in accordance with the views expressed in this memorandum and under the rules within ten days from notice hereof.