## VOWINCKEL v. FIRST FEDERAL TRUST CO. et al.

(Circuit Court of Appeals, Ninth Circuit. January 4, 1926.)

No. 4574.

1. **Evidence ⬤�150⟿46—Courts take judicial notice of President's proclamation.**

The courts will take judicial notice of convention between United States and other countries proclaimed by the President under date of August 3, 1907.

2. **War ⬤⟿12—Red Cross surgeon held not "enemy" of United States.**

Immigrant from Germany, who returned to Germany in 1915, and entered service of German army as a Red Cross surgeon, held, in view of convention proclaimed by the President August 3, 1907, not an "enemy" of the United States, within Trading with the Enemy Act, §§ 2, 9 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115½aa, 3115½e).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Enemy.]

Appeal from the District Court of the United States for the Southern Division of the Northern District of California; John S. Partridge, Judge.

Bill in equity by F. W. Vowinckel against the First Federal Trust Company and others. From a final decree dismissing the bill, plaintiff appeals. Reversed, with directions.

A. P. Black, of San Francisco, Cal., for appellant.

George J. Hatfield, U. S. Atty., of San Francisco, Cal., Ira Lloyd Letts, Asst. Atty. Gen., and C. W. McClean and Dean Hill Stanley, Sp. Assts. to Atty. Gen., for appellee Hicks.

Before HUNT, RUDKIN, and McCAMANT, Circuit Judges.

RUDKIN, Circuit Judge. This is an appeal from a final decree dismissing a bill in equity. It appears from the bill of complaint that the plaintiff was born in the kingdom of Prussia in 1861; that he attended various schools and colleges in that country and was there licensed to practice medicine in 1886; that he migrated from Germany to the United States in 1892, and ever since that date has been a bona fide resident of the state of California; that on the 22d day of December, 1892, he was licensed to practice medicine in that state, and ever since has practiced medicine and surgery therein; that in the year 1898 he declared his intention to become a citizen of the United States, and made application to be admitted to citizenship in January, 1915, but his application was not heard, owing to legal delays for which he was not responsible; that in September, 1915, being desirous of advancing in his profession and at the same time rendering aid to the wounded, and visiting a daughter then engaged as a Red Cross nurse in Germany, he left California and sailed from New York for Germany, with lawful authority from the United States government so to do; that upon his arrival in Germany he entered the service of the German army for the duration of the war as a Red Cross surgeon, and there remained as such Red Cross surgeon until the signing of the Armistice; that between October, 1915, and the close of the war he rendered service in France in the care of the sick and wounded, including German, French, English, and Russian soldiers, and men, women, and children, and all persons of all nationalities who were presented to him for medical treatment; that he was discharged as such Red Cross surgeon from the German army in March, 1919; that upon his discharge he was permitted to leave Germany and to take with him property inher-

ited from his parents there, because of the fact that he had not been a resident of Germany since 1892, and, according to German law, had ceased to be a German subject in 1900; that in August, 1919, he went to Norway, and there remained until December, 1920, when he went by steamer to the kingdom of Spain; that on divers occasions between the time of his arrival in Norway and the last-mentioned date he applied for a legal and proper visa to return to the United States, but such visa was refused on the ground that he had been declared an alien enemy, whose entrance into the United States was forbidden by law; that on the 6th day of October, 1917, Thomas Miller, Custodian of Alien Enemy Property, seized certain described property belonging to him; that he has demanded a return of such property in the manner prescribed by law, but that such return has been refused; that the appellant was at no time an alien enemy of the United States, and that he has no plain, speedy, or adequate remedy at law.

[1] In addition to the foregoing, the bill of complaint quotes at length from the convention between the United States and other countries, for the amelioration of the condition of the wounded of armies in the field, proclaimed by the President under date of August 3, 1907 (35 Stat. 1885). Of this, of course, the courts will take judicial notice. Articles 9, 12, and 13 of that convention are as follows:

"Art. 9. The personnel charged exclusively with the removal, transportation, and treatment of the sick and wounded, as well as with the administration of sanitary formations and establishments, and the chaplains attached to armies, shall be respected and protected under all circumstances. If they fall into the hands of the enemy they shall not be considered as prisoners of war.

"These provisions apply to the guards of sanitary formations, and establishments in the case provided for in section 2 of article 8."

"Art. 12. Persons described in articles 9, 10, and 11 will continue in the exercise of their functions, under the direction of the enemy, after they have fallen into his power.

"When their assistance is no longer indispensable they will be sent back to their army or country, within such period and by such route as may accord with military necessity. They will carry with them such effects, instruments, arms, and horses as are their private property.

"Art. 13. While they remain in his power, the enemy will secure to the personnel mentioned in article 9 the same pay and allowances to which persons of the same grade in his own army are entitled."

Section 2 of the Act of October 6, 1917 (40 Stat. 411 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½aa]) defines the term "enemy" as: "Any individual, partnership, or other body of individuals, of any nationality, resident within the territory (including that occupied by the military and naval forces) of any nation with which the United States is at war. * * * "

Section 9 (section 3115½e) provides that any person, not an enemy, or ally of an enemy, claiming any interest, right, or title to any money or other property which may have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian, and held by him or by the Treasurer of the United States, may institute suit in the District Court of the United States for the district in which such claimant resides, against the Alien Property Custodian or the Treasurer of the United States, to establish the interest, right, title, or debt so claimed, after complying with certain conditions precedent with which we have no present concern.

[2] The enemy character of the appellant is the only question for consideration on this appeal. If an enemy within the meaning of the law he may not maintain this suit under the express provisions of the Trading with the Enemy Act; otherwise, he may. And, first, was he a resident of Germany, or of territory occupied by the military and naval forces of that country? It would serve no purpose to review the multiplicity of decisions construing the term "resident," or "residence," in statutes relating to attachment, bankruptcy, divorce, elections, executors and administrators, guardian and ward, homesteads, insolvency, limitation of actions, paupers, naturalization, and schools. "'Residence' as used in various statutes has been considered synonymous with 'domicile,' but of course this depends upon the intent of the particular statute as ascertained by construction of its provisions. The terms are not necessarily synonymous. Generally, where a statute prescribes residence as a qualification for the enjoyment of a privilege, or the exercise of a franchise, and whenever the terms are used in connection with subjects of domestic policy, domicile and residence are equivalent." 19 C. J. 397.

What, then, did Congress mean by the term "resident," as employed in the Trading with the Enemy Act? Under a well-settled rule of international law, a foreigner living

and established in the territory of a state is to a large extent under its control; he cannot be made to serve it personally in war, but he contributes by way of payment of ordinary taxes to its support, and his property is liable, like that of subjects, to such extraordinary subsidies as the prosecution of a war may demand. Hall's International Law (8th Ed.) § 167.

In the following section the author says: "The chief test of the existence of such an identification of a neutral subject with an enemy state as will suffice to clothe him with an enemy character is supplied by the fact of domicile. For belligerent purposes a person may be said to be domiciled in a country when he lives there under circumstances which give rise to a reasonable presumption that he intends to make it his sole or principal place of residence during an unlimited time." And in a note to the section it is said: "The Anglo-American test of enemy character is based on domicile, using that word, as Westlake says, in a peculiar sense known as a 'trade domicile' in war."

No doubt, the prime object of the statute was to reach out and include those whose presence in the enemy country might aid it in some way in the prosecution of the war; but, if the act is merely declaratory of the international rule on the subject, it would seem that the appellant was not an enemy, because he never acquired a domicile in the enemy country for trade or otherwise, unless he changed his domicile by operation of law when he joined the German army, as claimed by the appellees. The appellees contend, however, that the appellant took up his domicile in Germany as a matter of law when he joined the German army, and that in any event he was an enemy, because he was an officer, official, agent, or agency of the German government, as defined by section 2 of the act. Did the appellant join the German army, within the meaning of this rule, or did he become an officer, official, agent, or agency of the German government, by simply entering the service of the German army as a Red Cross surgeon? It would seem not.

While from the necessities of the case Red Cross surgeons, nurses, and chaplains are in the service of the army in time of war, they form no part of the military forces proper, and, as will be seen by reference to the convention to which the United States is a party, they shall be respected and protected under all circumstances; if they fall into the hands of the enemy, they shall not be considered as prisoners of war; they shall continue in the exercise of their functions under the direction of the enemy after they have fallen into his power; they shall receive the same pay and allowances as persons of the same grade in his own army, and when their assistance is no longer indispensable they shall be sent back to their own army or country within such period and by such route as may accord with military necessity, taking with them such effects, instruments, arms, and horses as are their private property. Under these provisions, it would seem clear that Red Cross surgeons and nurses, who are engaged exclusively in ameliorating the condition of the wounded of the armies in the field, and in alleviating the sufferings of mankind in general, are not enemies of the United States in any proper sense of that term. They may come within the letter of the statute, but they do not come within its spirit, or within the intention of Congress. Thus, in Holy Trinity Church v. United States, 143 U. S. 457, 12 S. Ct. 511, 36 L. Ed. 226, the court held that a rector or minister of the gospel was not within the spirit or purpose of the contract labor law, although within its letter, saying: "It is a familiar rule that a thing may be within the letter of the statute, and yet not within the statute, because not within its spirit, nor within the intention of its makers."

It may appear upon the hearing that the appellant was an enemy because of his activities in Germany, or because of his relations to the German government or the German army; but that fact does not appear on the face of the complaint, which must be taken as true for present purposes.

The decree of the court below is therefore reversed, with directions to overrule the motion to dismiss, and for further proceedings not inconsistent with this opinion.