## GUESSEFELDT *v.* McGRATH, ATTORNEY GENERAL, SUCCESSOR TO THE ALIEN PROPERTY CUSTODIAN, ET AL.

No. 204.   Argued November 29, 1951.—Decided January 28, 1952.

*William W. Barron* argued the cause for petitioner. With him on the brief was *Robert F. Klepinger.*

*James D. Hill* argued the cause for respondents. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Baynton, George B. Searls* and *Irwin A. Seibel.*

Mr. Justice Frankfurter delivered the opinion of the Court.

This is a case brought under § 9 (a) of the Trading with the Enemy Act, 40 Stat. 411, as amended, 50 U. S. C. App. § 1 *et seq.*,[1] to recover property vested by the Alien Property Custodian. The District Court granted the Government's motion to dismiss, holding that plaintiff,

---

[1] Sec. 2. "The word 'enemy,' as used herein, shall be deemed to mean, for the purposes of such trading and of this Act—

"(a) Any individual, partnership, or other body of individuals, of any nationality, resident within the territory (including that occupied by the military and naval forces) of any nation with which the United States is at war, or resident outside the United States and doing business within such territory, and any corporation incorporated within such territory of any nation with which the United States is at war or incorporated within any country other than the United States and doing business within such territory."

Sec. 9. "(a) Any person not an enemy . . . claiming any interest, right, or title in any money or other property which may have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian or seized by him hereunder and held by him or by the Treasurer of the United States, . . . may file with the said custodian a notice of his claim under oath and in such form and containing such particulars as the said custodian shall require; . . . [S]aid claimant may institute a suit in equity in the District Court of the United States for the District of Columbia or in the district court of the United States for the district in which such claimant resides, or, if a corporation, where it has its principal place of business (to which suit the Alien Property Custodian or the Treasurer of the

while not "resident within" Germany within the meaning of § 2 of the Act, and thus "not an enemy" for the purposes of § 9 (a), was precluded from recovering by § 39 which provides that "No property . . . of Germany, Japan, or any national of either such country vested in . . . the Government . . . pursuant to the provisions of this Act, shall be returned to former owners thereof . . . ." 62 Stat. 1240, 1246, 50 U. S. C. App. (Supp. IV, 1946) § 39.[2] 89 F. Supp. 344. The Court of Appeals for the District of Columbia Circuit affirmed. 88 U. S. App. D. C. 383, 191 F. 2d 639. We brought the case here for clarification of the restrictions imposed by and the remedies open under the Trading with the Enemy Act. 342 U. S. 810.

Accepting the allegations as true for the purpose of dealing with the legal issues raised by the motions to dismiss, the situation before us may be briefly stated. Guessefeldt, a German citizen, lived continuously in

United States, as the case may be, shall be made a party defendant), to establish the interest, right, title, or debt so claimed, and if so established the court shall order the payment, conveyance, transfer, assignment, or delivery to said claimant of the money or other property so held . . . or the interest therein to which the court shall determine said claimant is entitled." 50 U. S. C. App. §§ 2, 2 (a), 9 (a).

[2] "Sec. 39. No property or interest therein of Germany, Japan, or any national of either such country vested in or transferred to any officer or agency of the Government at any time after December 17, 1941, pursuant to the provisions of this Act, shall be returned to former owners thereof or their successors in interest, and the United States shall not pay compensation for any such property or interest therein. The net proceeds remaining upon the completion of administration, liquidation, and disposition pursuant to the provisions of this Act of any such property or interest therein shall be covered into the Treasury at the earliest practicable date. Nothing in this section shall be construed to repeal or otherwise affect the operation of the provisions of section 32 of this Act or of the Philippine Property Act of 1946."

Hawaii from 1896 to 1938. In April of that year he took his family to Germany for a vacation. After the outbreak of war, he was unable to secure passage home before March, 1940, when his re-entry permit expired. When the United States entered the war, he was involuntarily detained in Germany, first by the Germans and after 1945 by the Russians, until July, 1949, when he returned to this country. During that time he did nothing directly or indirectly to aid the war effort of the enemy.

The first question to be decided is whether the claimant was "resident within" the territory of a nation with which this country was at war within the meaning of §§ 2 and 9 (a) of the Trading with the Enemy Act. He was physically within the enemy's territory. He contends, however, that the meaning conveyed by "resident within" is something more than mere presence; at the least a domiciliary connotation, if not domicile, is implied.

Legislative history leaves the meaning shrouded. Some use of the term "domicile" as the touchstone of enemy status is to be found in the Congressional hearings and reports.[3] But on the floor, Representative Montague, one of the managers of the bill, unequivocally stated under close questioning that the statutory language was intended to cover much more than those domiciled in enemy nations. Yet prisoners of war, expeditionary forces and

---

[3] See Statement of Hon. Robert Lansing, Secretary of State, Hearings before the House Committee on Interstate and Foreign Commerce on H. R. 4704, 65th Cong., 1st Sess. 3, 4. But see id., at 9. Assistant Attorney General Charles Warren, principal draftsman of the bill, testified that it had no application to Germans "domiciled" in this country. Id., at 34. And the House Report speaks of enemy status as being determined "not so much . . . by the nationality or allegiance of the individual, . . . as by his . . . commercial domicile or residence in enemy territory. The enemy domiciled or residing in the United States is not included . . . ." H. R. Rep. No. 85, 65th Cong., 1st Sess. 2.

"sojourners" were not, he said, intended to be included. 55 Cong. Rec. 4922.[4]

Guessefeldt retained his American domicile. Moreover, if anything more than mere physical presence in enemy territory is required, it would seem clear that he was not an "enemy" within the meaning of § 2. His stay before the war, as a matter of choice, was short. The circumstances negative any desire for a permanent or long-term connection with Germany. He intended, and indeed attempted, to leave there before this country entered the war. Being there under physical constraint, he is almost literally within the excepted class as authoritatively indicated by Mr. Montague. To hold that "resident within" enemy territory implies something more than mere physical presence and something less than domicile is consistent with the emanations of Congressional purpose manifested in the entire Act, and the relevant extrinsic light, including the decisions of lower courts on this issue, which we note without specifically approving any of them. See *McGrath* v. *Zander*, 85 U. S. App. D. C. 334, 177 F. 2d 649; *Josephberg* v. *Markham*, 152 F. 2d 644; *Stadtmuller* v. *Miller*, 11 F. 2d 732; *Vowinckel* v. *First Federal Trust Co.*, 10 F. 2d 19; *Sarthou* v. *Clark*, 78 F. Supp. 139.

Guessefeldt has the further obstacle of § 39 to clear before he can succeed. Congress in 1948, so the Govern-

---

[4] The validity of this construction is additionally suggested by the explanation in the Senate report of the parallel term of § 2, "doing business within such territory." According to the report that meant "having a branch or agency actively conducting business within that country." S. Rep. No. 111, 65th Cong., 1st Sess. 4. That is to say, not "domiciled" in enemy territory by American corporation law standards, but having a substantial, not casual or transitory connection with it. See also Hearings before a Subcommittee of the Senate Committee on Commerce on H. R. 4960, 65th Cong., 1st Sess. 136–137.

ment's argument runs, adopted a "policy of nonreturn," [5] and prohibited the restoration of vested property to a "national" of Germany. A citizen is a national, and Guessefeldt is a German citizen. Thus, even though he may, before the enactment of § 39, have been entitled to bring suit as a nonenemy under § 9 (a), that privilege has since been cut off. To which Guessefeldt counters that § 39 must be construed harmoniously with § 9 (a); the term "national" in the new section must accordingly be taken to mean only those German and Japanese citizens who could not theretofore have enforced the return of their property as of right. Section 39, in the context of its legislative history and in the light of the scheme and background of the statute, makes the Government's contention unpersuasive.

It is clear that the Custodian can lawfully vest under § 5 a good deal more than he can hold against a § 9 (a) action. *Central Union Trust Co.* v. *Garvan,* 254 U. S. 554; *Clark* v. *Uebersee Finanz-Korp.,* 332 U. S. 480. Thus Congress had to make provision for the disposal of two classes of vested property. Nonenemy property, lawfully vested under § 5, was recoverable in a suit against the Custodian. § 9 (a); see *Becker Steel Co.* v. *Cummings,* 296 U. S. 74. The second class, property owned by "enemies" and therefore not subject to recovery under § 9 (a), was reserved for disposition "[a]fter the end of the war . . . as Congress shall direct." 40 Stat. 411, 423, 50 U. S. C. App. § 12.

After both wars, Congress did adopt measures to dispose of this property. The Treaty of Berlin, 42 Stat. 1939, 1940, at the end of World War I, confirmed the possession of vested enemy property by the United States. *Junkers* v. *Chemical Foundation, Inc.,* 287 F. 597; *Lange* v. *Wingrave,* 295 F. 565; *Klein* v. *Palmer,* 18 F. 2d 932. For

---

[5] H. R. Rep. No. 976, 80th Cong., 1st Sess. 2.

present purposes it does not matter whether this action was taken simply to secure claims of American citizens against Germany or was regarded as the rightful withholding of spoils of war. In the Settlement of War Claims Act of 1928, 45 Stat. 254, 270, 50 U. S. C. App. §§ 9 (b)(12), (13), (14), (16), 9 (m), Congress provided for the return to admittedly enemy owners of 80% of their vested property. See *Cummings* v. *Deutsche Bank*, 300 U. S. 115.[6] Section 32 of the Trading with the Enemy Act, 60 Stat. 50, as amended, 50 U. S. C. App. (Supp. IV, 1946) § 32,

[6] The Resolution of July 2, 1921, terminating the state of war with Germany, provided that "All property of the Imperial German Government . . . and of all German nationals which . . . has . . . come into the possession or under control of . . . the United States . . . shall be retained . . . and no disposition thereof made, except as shall have been heretofore or specifically hereafter shall be provided by law." 42 Stat. 105, 106. By the Treaty of Versailles, art. 297 (d), "all the exceptional war measures, or measures of transfer . . . shall be considered as final and binding upon all persons." In art. 297 (i), Germany undertook "to compensate her nationals in respect of the sale or retention of their property, rights or interests in Allied or Associated States." The Treaty of Berlin, 42 Stat. 1939, 1940, incorporated these provisions of the Versailles Treaty, together with appendices defining "exceptional war measures" and cutting off the right of suit by German nationals against American officials on account of wartime action. An agreement of August 10, 1922, 42 Stat. 2200, established a Mixed Claims Commission to adjudicate claims of American nationals against Germany. Provisions for the return of vested property were made by successive amendments to § 9. Finally, in the Settlement of War Claims Act, 45 Stat. 254, 270, Congress provided for the return of 80% of their vested property to German enemies who would waive their claims to the remaining 20%. Germany in a debt funding agreement of June 23, 1930, deposited bonds with the United States, payments on which were to be applied to the settlement of awards of the Mixed Claims Commission. When Germany defaulted on these payments, Congress, by Public Resolution No. 53 of June 27, 1934, 48 Stat. 1267, suspended all deliveries of property under the Settlement of War Claims Act to German nationals until Germany should clear up the arrears.

enacted after World War II, provided for administrative returns of property to certain classes of "technical" enemies who were ineligible to bring suit under § 9 (a). Thus, if § 39 is treated as dealing only with property not otherwise subject to recovery, the consistency of the pattern of enactment is preserved. On the other hand, if the significant language of the section is regarded as requiring the retention of property which would otherwise be recoverable in a suit under § 9 (a), it would mark the first departure from what appears to be a heretofore consistent Congressional policy.

Section 39 was passed as part of a measure establishing a commission on the problem of compensating American prisoners of war, internees and others who suffered personal injury or property damage at the hands of World War II enemies. Congressional attention was focused on the nature and extent of these claims and methods of adjudicating them. The issues involved in § 39 were of peripheral concern. Reading the legislative history in this light, it lends support to the view that § 39 was conceived as dealing with property not otherwise subject to return. Senate hearings opened with detailed testimony analyzing the value of assets which would be left after payments for administration and liquidation, returns under § 32, and disbursements in satisfaction of judgments in suits brought under § 9 (a). Hearings before a Subcommittee of the Senate Committee on the Judiciary on H. R. 4044, 80th Cong., 2d Sess. 12–21. See also id., at 44, and Hearings before the House Committee on Interstate and Foreign Commerce on H. R. 873, 80th Cong., 1st Sess. 264. It seems clear that the legislation looks to the disposition of this fund, and the conclusion is reinforced by the provision of the section that "The net proceeds remaining upon the completion of administration, liquidation, and disposition pursuant to the provisions of this Act of any such property or interest

therein shall be covered into the Treasury at the earliest practicable date."

The tenor of the hearings demonstrates no purpose to change the existing scope of § 9 (a). The only reason a proviso to that effect was not included in § 39 as passed seems to be an assumption—unwarranted in the light of other evidence before the committees discussed below—that a national of any enemy nation had no rights under § 9 (a) in any case.[7] Indeed, the terms "enemy," "enemy alien," "enemy national," and "German or Japanese national" are used interchangeably in the hearings, not only by committee members but by witnesses from the Office of Alien Property, without regard to precise shades of meaning in the context of the Trading with the Enemy Act.

By § 39 Congress was manifesting its "firm resolve not to permit the recurrence of events which after the close of World War I led to the return of enemy property to their former owners." H. R. Rep. No. 976, 80th Cong., 1st Sess. 2. Those events, as we have seen, culminated in the Settlement of War Claims Act of 1928 permitting enemies as defined in § 2 of the Trading with the Enemy

---

[7] As it passed the House, the bill contained a provision suspending the payment out of vested assets of debts owed by enemies to citizens. In the Senate hearings, Representative Beckworth, who had sponsored that provision, urged the Senate to go further and suspend the payment of so-called "title claims" as well. He presented a draft amendment for the Senate committee's consideration which provided that "no property . . . shall be returned to former owners . . . except as directed by a court under § 9 (a) of the act." This was to be an addition to the provision which became § 39. Hearings before a Subcommittee of the Senate Committee on the Judiciary on H. R. 4044, 80th Cong., 2d Sess. 124. Both of these provisions were omitted from the bill reported by the Senate. Although this bit of legislative history reveals a certain amount of confusion about the operation of the Act, it is tolerably clear from it that the operation of § 9 (a) was not intended to be affected by the legislation.

Act to recover 80% of their vested assets. The major controversy on § 39 was whether this reversal of post-World War I policy was justifiable as a matter of international law or appropriate as a course of action for the United States. Opponents of the section considered the "policy of nonreturn" as applied to admitted enemies illegal, or at least unjust, confiscation of private property. To this point—and not to the issue before the Court in this case—were directed the references in the reports, H. R. Rep. No. 976, 80th Cong., 1st Sess. 2, and debate, 94 Cong. Rec. 550–551, on which the Government relies.

On the other hand, both Senate and House committees had before them testimony calling attention to the very problem now in issue. Hearings before the House Committee on Interstate and Foreign Commerce, *supra,* at 265; Hearings before a Subcommittee of the Senate Committee on the Judiciary, *supra,* at 197, 254. And one witness presented a draft substitute for the section, complex to be sure, which would expressly have saved cases like Guessefeldt's from the operation of the bill. *Id.,* at 233–236. This suggestion was not acted upon by the committee. Yet taken as a whole, the testimony on this issue was meagre and unimpressive. It was largely in written form, and therefore less likely to have been seen by or to have had impact on the committee members or to reflect their views. These considerations, taken together with the peripheral character of the problem from the committees' point of view, the consistent failure to appreciate the technical significance of the term "enemy national" in the framework of the Act, and the fact that the matters raised by this testimony were not touched upon in floor debate—all go far to overcome any presumption that the claimant's situation was considered by Congress and rejected.

Moreover, a decision for the Government would require us to decide debatable constitutional questions. In

suits by United States citizens, § 9 (a) has been construed, over the Government's objection, to require repayment of just compensation when the Custodian has liquidated the vested assets. *Becker Steel Co.* v. *Cummings, supra; Henkels* v. *Sutherland,* 271 U. S. 298; see *Central Union Trust Co.* v. *Garvan,* 254 U. S. at 566; *Stoehr* v. *Wallace,* 255 U. S. 239, 245. Such a construction, it is said, is necessary to preserve the Act from constitutional doubt. It is clear too that friendly aliens are protected by the Fifth Amendment requirement of just compensation. *Russian Volunteer Fleet* v. *United States,* 282 U. S. 481. The question which remains is whether a citizen in Guessefeldt's position of a nation with which this country is at war is deemed a friendly alien. More broadly, is any national of an enemy country within the reach of constitutional protection? The thrust of the Government's argument is that § 39 bars any such claimant on the mere showing of his citizenship. *Ex parte Kawato,* 317 U. S. 69, holds that as a matter of common law as well as interpretation of the Trading with the Enemy Act, a resident enemy national, even though interned, must be permitted access to American courts. And *The Venus,* 8 Cranch 253, seems to say that at common and international law, in the absence of hostile acts, enemy status, at least for the purpose of trade, follows location and not nationality. Cf. *Miller* v. *United States,* 11 Wall. 268, 310–311.

On the other side is Mr. Justice (then Judge) Cardozo's careful opinion in *Techt* v. *Hughes,* 229 N. Y. 222, 128 N. E. 185, holding that a national of an enemy country, wherever resident, is an enemy alien and that any mitigation of the rigors of that status, as in the right to sue, is a matter of grace. He suggests, however, that "enemy alien" for the purpose of trade with the enemy may be something different than for other purposes, but he had, of course, no occasion to consider whether this difference attained constitutional dimensions. In *Klein* v. *Palmer,*

*supra,* a suit by two resident German citizens, one proclaimed a dangerous enemy alien during World War I, against the Alien Property Custodian for damages and equitable relief, Judges Hough, L. Hand and Mack held that "the government was under no constitutional prohibition from confiscating the property of the enemy's nationals, whether resident or nonresident." *Id.,* at 934. It was the court's view that the class of nonenemies for the purpose of § 2 of the Trading with the Enemy Act was broader than the class entitled to just compensation under the Fifth Amendment.

Certainly, the constitutional problem is not imaginary, and the claim not frivolous which would have to be rejected to decide in the Government's favor. Considering that confiscation is not easily to be assumed, a construction that avoids it and is not barred by a fair reading of the legislation is invited.

The concern of the Trading with the Enemy Act is with problems at once complicated and far-reaching in their repercussions. Instead of a carefully matured enactment, the legislation was a makeshift patchwork. Such legislation strongly counsels against literalness of application. It favors a wise latitude of construction in enforcing its purposes. Cf. *Clark* v. *Uebersee Finanz-Korp.,* 332 U. S. 480; *Markham* v. *Cabell,* 326 U. S. 404; *Silesian-American Corp.* v. *Clark,* 332 U. S. 469.[8]

---

[8] Other than those here for review, six district court cases have involved construction of § 39. The Government contends that five of these have accepted the position it urges in this case. *Schill* v. *McGrath,* 89 F. Supp. 339; *Lippmann* v. *McGrath,* 94 F. Supp. 1016; *Bellman* v. *Clark,* Civ. No. 47–229 (S. D. N. Y. Nov. 8, 1948); *Mittler* v. *McGrath,* Civ. No. 3276–48 (D. D. C. Mar. 31, 1950); *Janner* v. *McGrath,* Civ. No. 3685–49 (D. D. C. Mar. 31, 1950). Even if this were true, it would present no such settled line of adjudication as to give pause to this Court in upsetting it. But at least three of these cases present no conflict with a decision in favor of the claimant here. In *Mittler, Janner* and *Lippman,* plaintiffs are enemies within § 2,

None of the considerations we have canvassed standing alone is conclusive in favor of the claimant. Perhaps none, by itself, would justify a decision in his favor. The cumulative effect, however, places such a decision well within the bounds of reasonable construction. We have said enough to show that the question is not free from doubt. On the balance, however, we think § 39 is properly construed as applying only to those German and Japanese nationals otherwise ineligible to bring suit under §9 (a).

The judgment below is

*Reversed.*

MR. JUSTICE CLARK took no part in the consideration or decision of this case.

MR. CHIEF JUSTICE VINSON, with whom MR. JUSTICE REED and MR. JUSTICE MINTON join, dissenting.

I dissent because I would read Section 39 as it is written. That Section plainly forbids return of vested property to *"any* national" of Germany or Japan.[1] Petitioner is a German citizen and the Court itself concedes

thus ineligible under § 9 (a), and because they are also citizens of Germany must be barred by § 39 whatever the meaning ascribed to the term "national" in that section. The same is possibly true of *Schill,* since the plaintiff there was interned as a dangerous enemy alien during the war. It might also be added that in *McGrath* v. *Zander, supra,* decided after the enactment of § 39, the Government apparently made no contention that the section would bar the suit, although on the Government's theory that result would clearly follow. Thus, analysis of the cases shows no such near unanimity in its favor as the Government contends.

[1] "No property or interest therein of Germany, Japan, or *any national* of either such country vested in or transferred to any officer or agency of the Government at any time after December 17, 1941, pursuant to the provisions of this Act, shall be returned to former owners thereof or their successors in interest, and the United States

that a German citizen is a German national. (Op. p. 320.) Yet the Court permits return of property to petitioner, limiting the application of Section 39 to *some* nationals, namely those nationals who are also "enemies" as the term is defined in Section 2 (a) of the Trading with the Enemy Act.

The term "national" has also been given legislative definition. "National" is defined as including "a subject, citizen or resident of a foreign country" in Executive Order No. 8389,[2] a regulation "approved, ratified, and confirmed" by Congress in 1941.[3] The Court applies Section 39 by reading out the term "national" and inserting the term "enemy" as defined in Section 2 (a). Since it is apparent on the face of the statute that Congress in no wise chose to assimilate these two clearly defined terms, the Court should not.

Just the other day, we held that "[w]e are not free, under the guise of construction, to amend [a] statute" by reading "carefully distinguished and separately defined terms to mean the same thing." *Pillsbury* v. *United Engineering Co.,* 342 U. S. 197, 199–200 (1952). In departing from that standard in this case, the Court rewrites Section 39 so that the Trading with the Enemy Act of 1917, as amended, will conform more closely to its own notions of statutory symmetry. Condemning that Act as

shall not pay compensation for any such property or interest therein. The net proceeds remaining upon the completion of administration, liquidation, and disposition pursuant to the provisions of this Act of any such property or interest therein shall be covered into the Treasury at the earliest practicable date. Nothing in this section shall be construed to repeal or otherwise affect the operation of the provisions of section 32 of this Act or of the Philippine Property Act of 1946." (Emphasis supplied.) 62 Stat. 1240, 1246 (1948), 50 U. S. C. App. (Supp. IV) § 39.

[2] § 5 (E) (i), 6 Fed. Reg. 2897, 2898 (1941).

[3] 55 Stat. 838, 840 (1941).

a "makeshift patchwork" does not justify a failure to read the 1948 addition of Section 39 as it was written by Congress. Statutory revision by this Court is not consistent with our judicial function of enforcing statutory law as written by the legislature.

In my view, this case should be decided on the basis of the legislatively defined language of Section 39. But the Court has broadened the inquiry. Even on the Court's own basis, the result in this case cannot be squared with the history of the Trading with the Enemy Act, the legislative background of Section 39 or the scope of Congress' war power over enemy property.

At the outset, it should be clearly understood that when petitioner's property was vested, he was an alien enemy in every ordinary sense of that term. So long as his citizenship was German, he became an enemy upon the declaration of war with Germany, wherever his residence and whatever his personal sentiments. This Court has so held throughout its history.[4] The Court today acknowledges that *Techt* v. *Hughes,* 229 N. Y. 222, 128 N. E. 185 (1920), so held after an exhaustive review of the authorities. It should be added that this Court recently adopted the rationale of *Techt* v. *Hughes, supra,* in *Johnson* v. *Eisentrager,* 339 U. S. 763, 771–773 (1950). Nor need we look only to judicial definition of petitioner's status. Congress has defined "alien enemies" as including "all natives, citizens, denizens, or subjects of the hostile nation or government."[5] As we so recently said, the classification between friend and enemy based upon citi-

---

[4] *The Rapid,* 8 Cranch 155, 161 (1814); *White* v. *Burnley,* 20 How. 235, 249 (1858); *The Venice,* 2 Wall. 258, 274 (1865); *The Benito Estenger,* 176 U. S. 568, 571 (1900); *Herrera* v. *United States,* 222 U. S. 558, 569 (1912).

[5] Alien Enemy Act of 1798, 1 Stat. 577, now 50 U. S. C. § 21. A similar definition of "alien enemies" had also been used in the naturalization laws. 2 Stat. 153, 154 (1802); R. S. § 2171. In World War I,

zenship, if ever "doctrinaire," has now been "validated by the actualities of modern total warfare." *Johnson* v. *Eisentrager, supra,* at 772.

When, in 1917, Congress defined the term "enemy" solely "for the purposes of" the Trading with the Enemy Act, it was aware that such status was ordinarily determined by "nationality or allegiance of the individual" rather than by "domicile or residence." [6] However, at that time, Congress chose to limit the definition of "enemy" to include only those persons "resident within" enemy territory—a definition which does not include petitioner on the pleadings in this case. Section 2 (a) of the Trading with the Enemy Act. This represented a deliberate "relaxation" and "modification" of Congress' power over enemy property.[7] This policy of modification was followed throughout the World War I alien property program, culminating in the Settlement of War Claims Act of 1928 which authorized return of 80% of seized property to its former owners.[8]

World War II legislation over alien property represented a complete reversal of the soft policy of World War I. In 1941, Congress extended the power of seizure and vesting to all property of "any foreign country or national thereof" in exercising its war power "to affirmatively compel the use and application of foreign property

---

Congress specifically exempted "alien enemies" from the draft, a context in which the term "alien enemy" would be meaningless if it did not include nationals of enemy nations residing in this country. 40 Stat. 76–78, 885, 955 (1917–1918)

[6] H. R. Rep. No. 85, 65th Cong., 1st Sess. 2 (1917).

[7] *Ibid.;* S. Rep. No. 111, 65th Cong., 1st Sess. 2 (1917); 55 Cong. Rec. 4842 (1917). See *Ex parte Kawato,* 317 U. S. 69, 76–77 (1942).

[8] 45 Stat. 254, 270–274 (1928), 50 U. S. C. App. §§ 9 (b) (12)–(14) and (16), 9 (m). Returns of German property were postponed in 1934 when it appeared that Germany was in default in the payment of war claims. 48 Stat. 1267 (1934).

in a manner consistent with the interests of the United States."[9]   In 1946, Congress added Section 32 to the Trading with the Enemy Act, authorizing administrative return of vested property subject to certain conditions, one of which prevented administrative return to a "citizen or subject of [an enemy] nation" who was "present . . . in the territory of such nation."[10]   Finally, in the War Claims Act of 1948, Congress added Section 39 to the Trading with the Enemy Act, thereby expressing its "firm resolve not to permit the recurrence" of the World War I policy of returning enemy property.[11]   The House Committee on Interstate and Foreign Commerce, in reporting favorably upon the bill, stated:

> "The policy of nonreturn and noncompensation is a sound public policy which should be enacted into law. . It does not violate any concepts of international law or international morality.   No essential difference exists between private property and public property in the case of Germany and Japan.   For several years before World War II while Germany and Japan were preparing to make war upon the United States, property owned in the United States by the citizens of both of these countries was subject to rigid control of their respective governments.   While the fiction of private ownership was retained, actually property of German and Japanese nationals in the United States was widely used to accomplish the national objectives of those countries.
>
> "The position of Germany and Japan (with respect to war claims against these countries) is somewhat

---

[9] 55 Stat. 838, 839 (1941), 50 U. S. C. App. § 5 (b) ; S. Rep. No. 911, 77th Cong., 1st Sess. 2 (1941).   See *Clark* v. *Uebersee Finanz-Korp.*, 332 U. S. 480 (1947).

[10] 60 Stat. 50 (1946), 50 U. S. C. App. § 32 (a) (2) (D).

[11] H. R. Rep. No. 976, 80th Cong., 1st Sess. 2 (1947).

analogous to that of a bankrupt against whom claims are apt to be filed in an amount greatly in excess of the bankrupt's assets. The legitimate claims of the United States alone, on account of the expense incurred in fighting World War II, will most likely exceed many times the assets available for payment even over a considerable period of years. Under these circumstances it is therefore not only expedient but just and fair for the United States to marshal all Japanese and German assets which are available in this country." [12]

Under this reversal of World War I policy, the property of German nationals, including petitioner's, was to be retained to satisfy war claims arising out of German aggression. The policy of non-return of vested property to German nationals restricts the scope of Section 9 (a) as to returns to German nationals such as petitioner who are not "enemies" as defined in Section 2 (a). The primary purpose of Section 9 (a)—to provide for judicial return of property mistakenly seized from American citizens or nationals of friendly countries—is preserved. [13] Such an interpretation of Section 39, reading the word "national" as meaning "national" and not "enemy," is far more harmonious with the entire Act and particularly the World War II legislation on alien property [14] than the Court's reading of the statute.

---

[12] *Id.*, at 2–3.

[13] Section 9 (a) was originally designed to protect American citizens, S. Rep. No. 111, 65th Cong., 1st Sess. 8 (1917), and apparently the bulk of the claims filed under § 9 (a) are those of American citizens. Hearings before Senate Committee on the Judiciary on H. R. 4044, 80th Cong., 2d Sess. 44 (1948).

[14] 1946 patent legislation likewise conforms to this pattern. In 1921, Congress barred claims based upon World War I use of patent rights of an "alien enemy." 41 Stat. 1313, 1314, 35 U. S. C. § 86. In 1946, Congress barred claims for patent infringement during World

Looking to the legislative history of Section 39 itself, the Court notes that congressional attention was focused on the problem of compensating prisoners of war, internees and others injured by our World War II enemies. With the claims of the victims of aggression pressed upon it, it is not surprising that, when Congress balanced those claims against the rights of enemy nationals to property lawfully vested by the Alien Property Custodian, it prohibited return of property to enemy "nationals" and not merely to "enemies" as restrictively defined in Section 2 (a) of the Trading with the Enemy Act of 1917. It cannot be fairly suggested that congressional use of the term "national" was inadvertent. Objections to the restriction on recovery of property under Section 9 (a) resulting from the use of the term "national" instead of "enemy" in Section 39 were pressed upon Congress in a written statement and in oral testimony before a congressional committee.[15] A witness offered a proposed amendment to Section 39 that would have limited its application to certain described enemy nationals.[16] Even

---

War II brought by a "national" of an enemy country. 60 Stat. 940, 944, 35 U. S. C. § 111. The failure to use the term "enemy" was deliberate. The next section of the 1946 Act refers to "rights of any enemy . . . as defined by the Trading With the Enemy Act . . . ." 60 Stat. 940, 944, 35 U. S. C. § 112. And the bill as drafted in the House Committee on Patents, H. R. Rep. No. 1498, 79th Cong., 2d Sess. (1946), used the term "national" as used in proposed bill H. R. 2111 (§ 9), rejecting the term "alien enemy" as used in the 1921 legislation and in proposed bill H. R. 4079 (§ 10). This was done after the difference in meaning of the term was called to the attention of the Committee by the Office of Alien Property Custodian. Hearings before the House Committee on Patents on H. R. 2111 and H. R. 4079, 79th Cong., 1st Sess. 105 (1945).

[15] Hearings before the Senate Committee on the Judiciary on H. R. 4044, 80th Cong., 2d Sess. 197–198, 233–234 (1948). See also *id.*, at 254–255, and 94 Cong. Rec. 551 (1948).

[16] *Id.*, at 235.

this amendment would not have saved petitioner's claim. It would not have substituted the term "enemy" as narrowly defined in Section 2 (a) of the Act and hence would not have limited the operation of Section 39 as drastically as the Court does today.

The Court closes with the statement that its construction of Section 39 avoids a constitutional problem which, it says, "is not imaginary." As discussed above, it is settled that petitioner is an alien enemy in every sense of the word but the purposely restrictive definition of Section 2 (a) of the Trading with the Enemy Act. "There is no constitutional prohibition against confiscation of enemy properties." *United States* v. *Chemical Foundation, Inc.,* 272 U. S. 1, 11 (1926), and cases cited therein. The suggestion that the relaxed legislative definition of "enemy" in 1917 could limit the constitutional war power of Congress over enemy property finds no support in decisions of this Court.[17]

---

[17] *Ex parte Kawato,* 317 U. S. 69 (1942), in holding that an enemy alien's right of access to federal courts was not barred by common law or statute, did not touch upon the constitutional power of Congress over enemy property. The extension of that power to include property of an American citizen resident in an enemy country, *The Venus,* 8 Cranch 253 (1814), hardly supports a restriction of that power in case of petitioner, an enemy citizen present in an enemy country.

In *Silesian-American Corp.* v. *Clark,* 332 U. S. 469, 475 (1947), the Court stated:

"There is no doubt but that under the war power [Art. I, § 8, cl. 11], as heretofore interpreted by this Court, the United States, acting under a statute, may vest in itself the property of a. *national* of an enemy nation. Unquestionably to wage war successfully, the United States may confiscate enemy property. *United States* v. *Chemical Foundation,* 272 U. S. 1, 11." (Emphasis added.)

In discussing the requirement that just compensation be paid for seizure of property of "friendly aliens," the Court had obvious reference to the nationals of friendly nations. 332 U. S. at 475–476, 479–480.

Petitioner, a German citizen present in Germany during the war, is certainly as much an enemy alien as was Ludecke, a German citizen lawfully resident in this country during the war. We found no constitutional barrier to Ludecke's summary removal without judicial scrutiny under the Alien Enemy Act of 1798. *Ludecke* v. *Watkins,* 335 U. S. 160 (1948). That opinion relied upon an excerpt from a paragraph by Chief Justice Marshall in *Brown* v. *United States,* 8 Cranch 110, 126 (1814), a case dealing with confiscation of property. 335 U. S. at 164. The full paragraph reads as follows:

> "War gives an equal right over persons and property: and if its declaration is not considered as prescribing a law respecting the person of an enemy found in our country, neither does it prescribe a law for his property. The act concerning alien enemies, which confers on the president very great discretionary powers respecting their persons, affords a strong implication that he did not possess those powers by virtue of the declaration of war."

Any doubts as to Congress' "equal right over persons and property" of enemy aliens should have vanished with the *Ludecke* decision. The Just Compensation Clause, like the Due Process Clause, is found in the Bill of Rights. As we said in our *Ludecke* decision, "it would savor of doctrinaire audacity now to find the statute offensive to some emanation of the Bill of Rights." 335 U. S. at 171. In addition to what was said in *Ludecke,* the admonition of Chief Justice Marshall in *Brown* v. *United States, supra,* is appropriate in this case:

> "Respecting the power of government no doubt is entertained. That war gives to the sovereign full right to take the persons and confiscate the property of the enemy wherever found, is conceded. The mitigations of this rigid rule, which the humane and

wise policy of modern times has introduced into prac-
tice, will more or less affect the exercise of this right,
but cannot impair the right itself.    That remains un-
diminished, and when the sovereign authority shall
chuse to bring it into operation, the judicial depart-
ment must give effect to its will.    But until that will
shall be expressed, no power of condemnation can
exist in the Court."    8 Cranch at 122–123.

The will of Congress having been expressed in unmistak-
able terms in Section 39, I would enforce, not frustrate, the
legislative command.