Paul ABRIKOSSOFF and Lilian Abrikossoff, Plaintiffs,

v.

Herbert BROWNELL, Jr., Attorney General of the United States, as Successor to the Alien Property Custodian,

and

Ivy Baker PRIEST, as Treasurer of the United States, Defendants.

Civ. A. No. 145–55.

United States District Court
District of Columbia,
Washington, D. C. Division.

Oct. 12, 1956.

J. Roy Thompson, Jr., Washington, D. C., Kenneth R. McDougall, Palo Alto, Cal., for plaintiff.

Dallas S. Townsend, Asst. Atty. Gen., and James D. Hill, Walter T. Nolte and Samuel Z. Gordon, Attys., Dept. of Justice, Washington, D. C., for defendants.

MORRIS, District Judge.

Plaintiffs seek to recover certain property vested by the Alien Property Custodian under the Trading with the Enemy Act, as amended,[1] and now held by defendants (the Attorney General having succeeded by Executive Order, No. 9788, 50 U.S.C.A.Appendix, § 6 note to the powers and duties of the Alien Property Custodian, and to the properties vested by him). Count I of the complaint invokes the jurisdiction of this Court under the Constitution of the United States, asserting that the decision of the Director of the Office of Alien Property denying the return of such property, pursuant to Section 32(a) (2) (C) [2] of the Act, to their

---

1. 50 U.S.C.A.Appendix, § 1 et seq.

2. "(a) * * * The President, or such officer or agency as he may designate, may return any property or interest vested in or transferred to the Alien Property Custodian · * * * whenever the President or such officer or agency shall determine—
* * * * *
' "(2) that ' such ' owner * * * are not—
* * * * *
"(C) an individual voluntarily resident at any time since December 7, 1941, with-

testator, Dmitry Abrikossow, was so arbitrary, capricious and unreasonable as to amount to a deprivation of due process under the Fifth Amendment to the Constitution. Count II invokes the Court's jurisdiction under Section 9(a)[3] of the Act. The case is before the Court on motion of each of the parties for summary judgment, and additional motion of defendants to dismiss Count I for lack of jurisdiction. In their points of authorities, supporting their motion, plaintiffs concede that the return of vested property under Section 32(a) of the Act is conditioned upon a determination of national interest under Section 32(a) (5), and ask that the case be remanded to the Attorney General for a determination of whether a return of the property to plaintiffs would be in the interest of the United States.

█ Our Court of Appeals has held that this Court is without jurisdiction to review decisions of the Director of the Office of Alien Property pursuant to Section 32(a), holding that Section 7(c) limits the means of reclaiming seized property to that provided by the Act itself, and that Section 9(a) provides the only judicial remedy for reclaiming vested property. McGrath v. Zander, 85 U.S. App.D.C. 334, 177 F.2d 649; Tiedemann v. Brownell, 96 U.S.App.D.C. 9, 222 F.2d 802. Defendants' motion to dismiss Count I of the complaint will, therefore, be granted.

Section 2 of the Act defines an enemy as "Any individual * * * of any nationality, resident within the territory * * * of any nation with which the United States is at war * * *."

Plaintiff's testator testified before the Hearing Examiner of the Office of Alien Property (transcript of which hearing is filed as an exhibit in this proceeding) that he went to Japan as an officer of the Czarist Embassy in Tokyo in 1916, remaining there in the Russian diplomatic service until 1925, when Japan recognized the Soviet regime. He then became stateless, but continued to remain in Tokyo as a private individual unofficially helping the White Russian refugees in their problems with the Japanese Government. He unquestionably was imbued with the idea that he alone could furnish the necessary assistance and consolation to his compatriots, and that it was his duty to remain in Japan, though he had formed the intention of some day making the United States his home, which intention he had expressed to a number of his friends in the diplomatic service of allied countries. In 1925 he rented a house in Tokyo, and from that date received no compensation for his services, living solely on his savings. Although he testified that there was surveillance of him by the Japanese political police and other inconveniences before, and to a greater extent during, the war, such acts fall short of persecution. In the late prewar days, it seems he wished to leave Japan before a war might commence, but he also seems to have misjudged the imminence of such circumstance.[4] He al-

---

in the territory of such nation * * * [Japan] * * *: *Provided*, That an individual who, while in the territory of a nation with which the United States has at any time since December 7, 1941, been at war, was deprived of life or substantially deprived of liberty pursuant to any law, decree, or regulation of such nation discriminating against political, racial, or religious groups, shall not be deemed to have voluntarily resided in such territory".

3. 9(a) "Any person not an enemy or ally of enemy claiming any interest, right, or title in any money or other property which may have been conveyed, transferred, assigned, delivered, or paid to the Alien

Property Custodian or seized by him hereunder * * * may institute a suit in equity in the Supreme Court of the District of Columbia * * * to establish the interest, right, title * * * so claimed * * *."

4. The following is an excerpt from the testimony of Dmitry Abrikossow (Pl.Ex. 13, Tr. 126):
"Q. Did you apply for a visa to enter the United States? A. I asked for general information, but as I say it was my desire I should remain. I was needed by my Russians, because to apply for a visa you must decide absolutely, for there is a term for the visa. You can't put it off.
"Q. You never reached the position

ways held the Soviet Government in contempt, but was fearful of voicing, except to his diplomatic friends of allied countries, his sympathies for the allied cause because of reprisals which he felt would be visited upon him. He made application after Pearl Harbor to the proper representative to be transported to the United States on Swiss boats which were bringing Americans from Japan to the United States, which application was denied because of the lack of space. Thereafter, in November 1942, the Japanese having restricted the amount of money he could draw from his account in the Japanese bank to a small monthly sum, insufficient to sustain himself in Tokyo, he accepted the invitation of a compatriot to move into his home at Kobe, where also there was greater security from bombings by the United States. About a year after making effort to obtain necessary papers to come to the United States, he received on September 17, 1946, from the American Vice Consul of Yokohama a document in the nature of a passport with an American visa affixed thereon, and was transported to the United States on an army transport vessel, and admitted at San Francisco on November 4, 1946, as a Russian quota immigrant for permanent residence. He thereafter resided in Palo Alto, California, having on March 4, 1947, made formal declaration before the District Court of the United States at San Francisco of his intention to become a United States citizen.

■ Under the interpretation of the term "resident within" by the Supreme Court in Guessefeldt v. McGrath, 342 U.S. 308, 72 S.Ct. 338, 96 L.Ed. 342, I think plaintiffs' testator had been resident within Japan for sometime prior to Pearl Harbor, and that, although he intended to change his residence to that of the United States, he did not do so until his arrival here in 1946, thus making him an "enemy" within the meaning of the Act during the period in question.

where you decided, "I want to go in six months," or, "I want to go in one year," so that you could apply definitely for it?

In these circumstances, defendants' motion for summary judgment as to Count II of the complaint will be granted.

Counsel will prepare appropriate order carrying this decision into effect.

A. I reached this decision when it was too late.
"Q. After the war started? A. Yes. I was putting off all the time."