**Elizabeth Vincze ROBOZ, and Andrew Vincze, Plaintiffs,**

**v.**

**Robert F. KENNEDY, Attorney General of the United States, Defendant.**

**Civ. A. No. 580-60.**

United States District Court
District of Columbia.

July 2, 1963.

Spaulding, Reiter, & Rose, Washington, D. C., Thomas Field, New York City, of counsel, for plaintiff.

Robert J. Wieferich, Attorney, U. S. Department of Justice, David C. Acheson, U. S. Atty., John W. Douglas, Asst. Atty. Gen., Civil Division, Anthony L. Mondello, Attorney, Department of Justice, Washington, D. C., for defendant.

YOUNGDAHL, District Judge.

This is a suit for the return of property vested in the Attorney General under the International Claims Settlement Act, as amended in 1955 to deal with Bulgaria, Hungary, and Rumania, 22 U.S.C. § 1631. The suit is brought pursuant to § 1631f(a), which provides that any person who has not pursued an administrative remedy for the return of vested funds "may institute a suit in equity" in the United States District Court for the District of Columbia "by the filing of a complaint which alleges—"

"(1) that the claimant is a person other than Bulgaria, Hungary, or Rumania, or a national thereof as defined in Executive Order 8389 of April 10, 1940, as amended; and

"(2) that the claimant was the owner of such property immediately prior to its vesting, or is the successor in interest of such owner by inheritance, devise, or bequest."

Plaintiff has made both these essential allegations. The defendant, however, has moved to dismiss the complaint for lack of jurisdiction on the ground that the plaintiffs are "nationals" of Hungary within the meaning of Executive Order 8389, mentioned in paragraph (1), supra, the so-called "freezing order" of April 10, 1940, set forth following 12 U.S.C.A. § 95a.

Executive Order 8389 defines the word "national" to include:

"Any person who has been domiciled in, or a subject, citizen or resident of a foreign country at any time on or since the effective date of this Order * * *."

The Order was applied to Hungary on March 13, 1941. 6 F.R. 2897. The issue, therefore, is whether the undisputed facts demonstrate that plaintiffs were "domiciled in, or a subject, citizen or resident of" Hungary after March 13, 1941. If the facts do so demonstrate, then defendant's motion must be granted and the case dismissed.

The following facts must be accepted as true for purposes of this motion. Plaintiffs are mother and son, the widow and sole child, respectively, of Erno Vincze, a Jew who was killed in the Dachau concentration camp on January 14, 1945, and who before the war was one of Hungary's leading leather manufacturers. In 1940, when Jews were being persecuted, Erno Vincze transferred funds to New York; it is the proceeds of these funds which plaintiffs seek in this action. On May 28, 1940, within several weeks after the transfer of these funds to New York, Erno Vincze was arrested without charge, was placed in the Margit-Korut military prison in Budapest, was "beaten inhumanly" for weeks, his factory was seized by the government, and he did not face charges for over two years. His wife, one of the plaintiffs herein, tried unsuccessfully to find a lawyer who would help her obtain her husband's release. She then wrote a letter to a government ministry pointing out that her husband had been imprisoned without any charge having been given. Shortly thereafter, she was arrested too, and was imprisoned without charge for nine months. While she was in prison, her husband was tried by a secret military tribunal, which found him guilty of certain (unspecified) crimes, and sentenced him to eleven years in prison. He remained in the Margit-Korut prison until the Russian troops approached Budapest in December, 1944. He was then sent to Dachau, and was killed in a gas chamber on January 14, 1945.

In the meantime, all of the family's business property was confiscated. The two plaintiffs herein were forced to abandon their home and move to designated "Jewish houses" where ten strangers lived in one room and from which plaintiffs were allowed to leave for only two hours each day. Plaintiffs could not vote, they could not earn a living, they lacked police protection, and they had no access to the courts. Thousands of Jews were being sent to concentration camps, but plaintiffs escaped such fate by hiding in fields and cellars. They were in Budapest all during this period.

As far as plaintiffs' intent is concerned, the mother states as follows:

"In view of the increasing Nazi orientation of the Hungarian Government, my husband and I had made plans since 1939 to leave Hungary permanently. * * * Both my son and I obtained United States visas in 1940 and were to leave Hungary in 1940 forever. The imprisonment of my husband made this impossible and was the only reason why we did not leave in 1940. I made every possible attempt to secure his release with a view to fleeing the country if I succeeded. We wanted to leave the country at whatever cost as soon as my husband had been released. Unable to obtain his release, we did not depart solely because of the dire consequences to my husband which could be expected to follow our departure."

Immediately after the war, the mother states that her intention continued to be to leave Hungary:

> "Continuing my resolve to leave the country which had subjected me to such unspeakable persecution and which immediately fell under a dictatorship of a different hue, I could hardly wait to leave the blood stained soil and made every effort to depart at the earliest possible moment. I finally succeeded * * * early in 1947, and arrived in the United States in May 1947 resolved never to return to Hungary under any circumstances."

The son became a United States citizen in 1952. The mother did so in 1954. Both have resided in the United States continually from their arrival in 1947. They arrived in 1947 on visitors' visas.

Given these facts, were plaintiffs "domiciled in, or a subject, citizen or resident of" Hungary within the meaning and purpose of the International Claims Settlement Act? All of the words in that definition imply some reciprocal duties and obligations between the person and the country. The facts as outlined above demonstrate conclusively that plaintiffs had a firm and continuing intent to leave Hungary forever before March 13, 1941, the date Executive Order 8389 was applied to Hungary. In addition, they lost their home, they had no rights in law, they could not vote. Clearly, they were involuntarily in Hungary. They therefore cannot be considered either domiciled in, or subjects, citizens or residents of Hungary for purposes of a suit under 22 U.S.C. § 1631 f(a). Congress could not have intended so inequitable a result, and Congress

has specified that, in proceedings under this section, this Court sits as a court "in equity." Ibid.

This is apparently a case of first impression under this statute, since the only other reported case was dismissed because the claimant failed to allege that she was not a "national" of her country of origin, Rumania. Schrager-Singer v. Attorney General of the United States, 106 U.S.App.D.C. 258, 271 F.2d 841 (1959). There are, however, cases under section 9(a) of the Trading with the Enemy Act, 50 App.U.S.C.A. § 9(a), which are analogous, and support the Court's conclusion. See McGrath v. Zander, 85 U.S.App.D.C. 334, 177 F.2d 649 (1949); Kaku Nagano v. McGrath, 187 F.2d 759 (7th Cir., 1951); Guessefeldt v. McGrath, 342 U.S. 308, 72 S.Ct. 338, 96 L.Ed. 342 (1952). "[O]ur concept of a citizen is one who has the right to exercise all the political and civil privileges extended by his government * * *. Citizenship conveys the idea of membership in a nation." Kaku Nagano, supra, 187 F.2d at 768. "' "[R]esident within the territory" * * * connotes something different from and more than living within the specified areas. It is rather indicative of a settled and permanent place of abode, volitionally acquired and voluntarily assumed. * * *'" McGrath v. Zander, 85 U.S.App.D.C. at 337, 177 F.2d at 652. "Such legislation strongly counsels against literalness of application. It favors a wise latitude of construction in enforcing its purposes." Guessefeldt, 342 U.S. at 319, 72 S.Ct. at 344, 96 L.Ed. 342.

The defendant's motion will therefore be denied.