**YAICHIRO AKATA, Plaintiff,**

v.

**Herbert BROWNELL, Jr., Attorney General of the United States, and as Successor to the Alien Property Custodian, Defendant.**

**Civ. A. No. 1344.**

United States District Court
D. Hawaii.

Nov. 3, 1954.

Tsukiyama & Yamaguchi, Ralph T. Yamaguchi and Harry T. Tanaka, Honolulu, Hawaii, for plaintiff.

Louis B. Blissard, U. S. Atty., Honolulu, Hawaii, Leon R. Gross, Sp. Asst. to the Atty. Gen., for defendant.

WIIG, District Judge.

Yaichiro Akata, a national of Japan, brought this suit under Section 9(a) of the Trading with the Enemy Act, as amended, 50 U.S.C.A.Appendix, § 1 et seq., to recover property vested by the Alien Property Custodian.

The property, which was vested by Vesting Order 9407, dated July 16, 1947, consisted of the plaintiff's home in Honolulu, some furniture, a bank account, and rents collected on account of occupancy by others of the home, all of a value of approximately $19,000. Due notice of claim was made by plaintiff prior to the filing of this suit.

The court has jurisdiction of the case.

Akata was born in Japan on August 7, 1890. He entered the United States at Honolulu, Hawaii, on January 8, 1907, and after residing on the Island of Maui for a period of eleven years, he moved to Honolulu and resided there continuously until March 1943. In addition to going to school on Maui, it appears that he was at all times gainfully employed. According to the *Koseki Tohon*, the family register, he married his wife on November 19, 1919, a son was born in Japan on November 25, 1919, and the marriage was solemnized in Honolulu by a formal ceremony in 1920. After the birth of his second son, he entered into an agreement to purchase a home in Honolulu on an installment contract (May 1923), and while living in this home three sons and two daughters were born. Prior to September 21, 1942, Akata and his family appeared in all respects to be living in this community in a manner like that of hundreds of other families similarly situated, the children attending schools, the father employed as a salesman in a large corporation, and the family living as a unit in their home. Likewise, prior to December 7, 1941, plaintiff refused requests that he return to Japan, and gave to a younger brother real property in Japan which he, plaintiff, as the eldest son, had inherited from his father.

On September 21, 1942, after a brief hearing before a military intelligence officer and a hearing by a board of investigation, Akata was taken into custody and interned as a Japanese alien. The substance or nature of any charges preferred against him were not disclosed at the trial of this case. He denied that he did anything directly or indirectly to aid the war effort of the Japanese Government. The military authorities detained him at Sand Island in Honolulu Harbor until March 1, 1943. During this period, his wife was allowed to visit him but one time. From Sand Island, he was shipped to a detention camp at Sharp Park, California, thence to Santa Fe, New Mexico, and finally to Crystal City, Texas. While thus detained, he executed three petitions for repatriation and one application for repatriation to Japan, all containing a request that repatriation be granted only if his wife and six children could accompany him. His wife executed a similar application at Crystal City, Texas, with the same condition. It is interesting to note that with respect to the applications, the reviewing officer certified they had little or no merit.

On March 31, 1945, Akata's wife and four younger children joined him at Crystal City. One month later, the other two sons, who had been interned at Tule Lake, California, also joined the family. While at Tule Lake, the two sons renounced their American citizenship.[1] Reunited in this fashion, the family lived at Crystal City in the detention camp, which was surrounded by a high wire fence, with watchmen in high towers within the compound. In December 1945, the family was transported from this temporary place of abode to Seattle, Washington, and thence by ship to Japan at the expense of the United States Government. After a time, Akata settled down to farming on a portion

---

[1]. In this connection, see McGrath v. Tadayasu Abo, 9 Cir., 186 F.2d 766; Acheson v. Murakami, 9 Cir., 176 F.2d 953; Abo v. Clark, D.C.N.D.Cal., 77 F.Supp. 806.

of the land which he had previously inherited from his father, and because of the death of his younger brother, he was placed in a position where he purchased some of the land, under a policy administered by the Occupation authorities that occupants of farm land would have a priority in the right to purchase the land. The money was furnished by two of his daughters who had found gainful employment. In the fall of 1947, he was informed that his property in Honolulu, the subject of this action, had been vested. He made inquiries in 1947 relative to returning to Hawaii, and finally was able to return under a passport of Japan bearing an immigration (nonquota) visa issued by the American Consular Service under Section 4(b) [2], dated December 3, 1952, and showing the date of admission to be December 17, 1952.

Section 9(a) of the Trading with the Enemy Act permits a suit in a Federal District Court for the return of property vested by the Alien Property Custodian to any person not an enemy or ally of an enemy of the United States. The term "enemy" is defined in Section 2 of the Act as follows:

"(a) Any individual, partnership, or other body of individuals, of any nationality, resident within the territory * * * of any nation with which the United States is at war * * *."

The "policy of nonreturn" prohibiting the restoration of vested property to a national of Japan, as contained in Section 39 of the Trading with the Enemy Act, would appear to bar plaintiff's claim were it not for the clarification of Sections 2, 9(a) and 39 by the Supreme Court in Guessefeldt v. McGrath, 342 U.S. 308, 72 S.Ct. 338, 341, 96 L.Ed. 342.

Whether Akata is an "enemy" by reason of having been "resident within" the territory of any nation with which the United States was at war must be determined under the rules laid down in Guessefeldt v. McGrath. If he can show that he is not an enemy as defined by Section 2, then he is entitled to recovery under Section 9(a), even though it is admitted he is a national of Japan. It is therefore necessary to determine from the evidence whether Akata was a "resident within" a country with which the United States was at war at the time his property was vested by the Alien Property Custodian. The rule set forth in Guessefeldt "that 'resident within' enemy territory implies something more than mere physical presence and something less than domicile" does not admit of easy application in the present case. In Nagano v. McGrath, 7 Cir., 187 F.2d 759, affirmed (by divided court) 342 U.S. 916, 72 S.Ct. 363, 96 L.Ed. 685, the court approved the epitomization of several rulings interpreting the term "resident within" taken from Sarthou v. Clark, D.C.S.D.Cal., 78 F.Supp. 139, 142, in the following language:

" * * * 'resident within the territory' as employed in the Act connotes something different from and more than living within the specified areas. It is rather indicative of a settled and permanent place of abode, volitionally acquired and voluntarily assumed. It is a habitation having domiciliary properties."[3]

A careful search of the reported cases has been fruitless with respect to the return of an alien to his native land *after* the cessation of hostilities between the warring nations and the subsequent vesting of his property located in the United States on the ground that he

---

2. Section 4(b) of the Nationality Act of 1940, 8 U.S.C.A. § 204(b), now 8 U.S.C.A. § 1101(a) (27) (B), reads in part as follows:

"When used in this chapter the term 'nonquota immigrant' means—

* * * * *

"(b) An immigrant previously lawfully admitted to the United States, who

is returning from a temporary visit abroad".

3. In this connection, see McGrath v. Zander, 85 U.S.App.D.C. 334, 177 F.2d 649; Stadtmuller v. Miller, 2 Cir., 11 F.2d 732, 45 A.L.R. 895; Vowinckel v. First Federal Trust Co., 9 Cir., 10 F.2d 19; Public Administrator of N. Y. County v. McGrath, D.C.S.D.N.Y., 104 F.Supp. 834.

was a resident of his native land and a national of a designated enemy country. Nor has any case been found setting forth circumstances similar to those in this case, where the claimed abandonment of a permanent residence was set into motion (however justified) by the nation which now seeks to retain the property it seized from the alien whose place of residence is now questioned.

Akata had been a permanent resident of the Territory of Hawaii continuously for thirty-six years prior to March 1943. There is nothing before the court to indicate that he would have changed his residence had it not been for his involuntary internment, which was a consequence of World War II.

The consequences resulting from plaintiff's internment, even though justified under the awful exigencies of war, made a terrific impact on him—an abrupt termination of his family and workaday life, loss of earning power to support himself and his dependents, a lengthy separation from his wife and children and their home, a feeling of shame and guilt engendered by suspicion, a barren existence in barren camps, insecurity, and little hope for the future. His first and strongest urge under the circumstances was to care for his family. Before leaving Sand Island, he was informed that his family would go to the mainland United States with him, but he went alone. At Sharp Park, he heard "that only those who were going back to Japan were able to call their families." Thereafter, the first petition for expatriation was signed. Subsequent petitions and the final application for repatriation were executed for the purpose of getting the family together. The decision to return to Japan was based largely on a desire to keep the family together, uncertainty as to conditions in Honolulu with respect to employment, and a hope that the two sons who had renounced their American citizenship might obtain work in occupied Japan.

In this dilemma, the bonds of the plaintiff with his brother in Japan and the ancestral estate must have come into play. Upon arrival in Japan, he learned that his brother had died, the land was occupied by his widow, a complete stranger, and she was planning to sell the property. "We were in a predicament so I told them to let me stay there and we stayed there," said the plaintiff, until October 15, 1949, where he and his wife engaged in farming. After that, plaintiff and his wife moved to Tokyo and lived with their sons.

Plaintiff testified that when he went to Japan in 1945 he did not intend to stay there permanently and that he considered his home, at that time, to be in Honolulu. This declaration as to state of mind can only be accepted if all the other facts and circumstances, as shown by the evidence, support the truthfulness of the assertion. In this connection the court was favorably impressed by plaintiff while on the witness stand. He was the only witness to give testimony.

It is the court's opinion that the involuntary nature of Akata's departure from his settled and permanent place of abode in Honolulu on September 21, 1942, infected whatever actions he took thereafter. A necessary factor in the change of domicile, or even something less than domicile, is a free and dispassionate decision to abandon that which has meant security, offered opportunity and happiness, and has been a "home" in the fullest sense that we in America like to understand that familiar word. Through no apparent fault of his own, Akata was denied the privilege of making that decision in such a manner. The basic urge to gather one's family together and to keep it intact could very well be in normal circumstances, and often is, the reason for change of domicile. However, in order to effect the change, there must be a voluntary abandonment of a settled and permanent place of abode coupled with the acquisition of a new domicile freely and voluntarily assumed. At what point can it be said Akata voluntarily and freely de-

cided to abandon his domicile in Honolulu? Prior to the actual cessation of hostilities, he knew that he and his family could not be transported to Japan. The last applications for repatriation made by Akata and his wife were executed thirteen days after announcement of the Japanese surrender and five days before the formal surrender signed in Tokyo Bay on September 2, 1945. Transportation to Japan was furnished to these "wards"[4] of the United States less than four months later. There is no evidence, and the court can find no reason for assuming, that during this period a mental antibiotic sterilized and cured the deep-seated infection implanted in September 1942, when forced removal from his home effected a physical "abandonment" of the Honolulu residence.

Nor does the testimony reflect the acquisition by Akata of an established and permanent place of abode in Japan. First, as a means of existence, he resorted to farming, the same occupation which he disliked and which prompted him to come to Hawaii in 1907. Defendant urges that his purchase of the land which he had been cultivating, and additional land, strongly indicates an intention to make Japan his permanent residence. However, the circumstances under which it was purchased, the reasons for staying, and the fact that plaintiff remained on the land for a period of two years are not decisive.

Defendant also urges that because Akata gave his eldest son authority to control the farm lands during plaintiff's present absence from Japan, there is a strong indication that he intends to return to Japan. This may be answered by saying that good business judgment required that a responsible person be left in charge, and with plaintiff's experience in this case, common sense dictated the need for control during his absence, however short or prolonged.

In his argument that plaintiff offered no evidence relative to the purpose of his return to Hawaii, defendant overlooked a pertinent statement in plaintiff's Exhibit "A", his Japanese passport, which reads:

"I, the undersigned, Minister for Foreign Affairs of Japan, request all those whom it may concern to allow *Mr. Yaichiro Akata*, a Japanese national, proceeding to *the United States of America for permanent residence on return thither*, to pass freely and without hindrance and in case of need to afford every possible aid and protection.
"*29 November 1952.*"

(Italicized words penned on printed form.)

Finally, defendant urges that the continual maintenance of a *Koseki Tohon*, literally "the family register", at his father's farm in Japan, which is an ancient Japanese custom and consists of a record of births, marriages and deaths of the family, and in which it is recited that plaintiff's "permanent domicile" is at that address, indicates that at all times plaintiff considered himself a permanent resident of Japan. This statement in the register belies the facts concerning domicile now before the court, and certainly is entitled to less weight than the recital contained in the deed of May 3, 1923, wherein the plaintiff is described as a resident of Honolulu, and the requests for repatriation, made some twenty years later, wherein the residence of plaintiff's family is given as "1677 Waikahalulu Lane, Honolulu, T. H."

The court finds that at no time did the plaintiff freely and voluntarily abandon his permanent residence in Honolulu with the intention of taking up a new and permanent residence of his own choice in Japan. His physical presence in Japan from December 1945 until December 1952 under the circumstances as disclosed by the evidence in this case did not make him a "resident within" enemy territory within the meaning of Section 2 of the Trading

---

4. An appropriate noun is difficult to find.

with the Enemy Act. It follows, therefore, that Akata was not an "enemy" of the United States and he is entitled to recovery in accordance with the tenor of his complaint.

Judgment for plaintiff will be entered upon presentation.

