Herbert BROWNELL, Jr., Attorney General, and as Successor to the Alien Property Custodian, Appellant,

v.

Anni H. J. E. OEHMICHEN, Appellee.

No. 13424.

United States Court of Appeals
District of Columbia Circuit.

Argued Dec. 7, 1956.

Decided Feb. 28, 1957.

Petition for Rehearing Denied
March 29, 1957.

Mr. George B. Searls, Attorney, Department of Justice, with whom Mr. Victor R. Taylor, Attorney, Department of Justice, was on the brief, for appellant.

Mr. James H. Mann, Washington, D. C., with whom Mr. Dean B. Lewis, Washington, D. C., was on the brief, for appellee.

Before EDGERTON, Chief Judge, and PRETTYMAN and BASTIAN, Circuit Judges.

PRETTYMAN, Circuit Judge.

Appellee Anni H. J. E. Oehmichen, widow of Erhard M. Oehmichen, brought a civil action against the Attorney General under the Trading with the Enemy Act[1] to establish her right in certain property vested by the Alien Property Custodian in 1947, 1950 and 1951. The property consisted of checking accounts in Chicago and Newark banks, shares of stock in a corporation formerly controlled by Mr. Oehmichen, and a claim against that corporation. After trial the District Court made findings of fact and conclusions of law and entered a judgment directing the Attorney General to

1. Sec. 9, Act of Oct. 6, 1917, 49 Stat. 419, as amended, 50 U.S.C.A.Appendix, § 9(a).

transfer to Mrs. Oehmichen all of the property. The Attorney General appeals.

Mr. and Mrs. Oehmichen were German citizens. They entered the United States separately in 1933, were married in London in 1934, and returned to the United States that same year. They entered for permanent residence. They engaged in the importing business, principally from Germany. Shortly after the declaration of war with Germany they were arrested as enemy aliens. After a hearing before an Alien Enemy Control Board Mr. Oehmichen was ordered interned for the duration of the war. Subsequently, in December, 1942, he was interned at the Crystal City, Texas, Alien Internment Camp. Mrs. Oehmichen voluntarily joined him in internment. Beginning in May, 1942, the Oehmichens from time to time filed requests for repatriation to Germany. They were finally repatriated and sailed on the Gripsholm early in January, 1945. On January 29, 1945, they arrived in German-held territory at Bregenz, Austria. They lived there until October, 1945, when they moved, first to Bavaria, then to Hamburg, and then to Wiesbaden. Mr. Oehmichen died in Wiesbaden in May, 1948. Later that year Mrs. Oehmichen went to Switzerland, obtained a visa from an American consul, and came to the United States as an immigrant. She has since become a citizen of the United States and reestablished the import business.

Section 9 of the Trading with the Enemy Act permits any person not an enemy to institute a civil action for the recovery of property seized by the Alien Property Custodian. Section 2 of that Act defines "enemy" to include "Any individual * * * of any nationality, resident within the territory (including that occupied by the military and naval forces) of any nation with which the United States is at war". The Attorney General argues that on the face of the statute and on the face of the facts Mrs. Oehmichen was resident within enemy territory and therefore an enemy not entitled to bring an action for recovery of seized property.

The District Court held that the Oehmichens were not resident within enemy territory, because they went there as a matter of choice in preference to internment, that choice being dictated by the rigors of internment and their difficulties with other internees. The District Court found that the Oehmichens were well treated by the authorities but that pro-Nazi groups, which were in the majority at the internment camp, "continually stirred the emotions, fears and anxieties of plaintiff and her husband." It found that Mr. Oehmichen was once physically attacked, once a stone was thrown at him, once they were shouted at, and they were ostracized by the pro-Nazi groups. The court found: "The requests for repatriation to Germany by plaintiff and her husband were made solely to escape internment and the emotional problems created thereby."

The Oehmichens were citizens of Germany and were actually living on German territory during the war. If they had had their way they would have been in Germany for the duration of the war. In May, 1942, Mr. Oehmichen executed and filed a petition for repatriation "In the event of my internment" and further petitioned that his wife be permitted to accompany him "to my native land". Thereafter letters and petitions were filed July 8, 1942, July 26, 1942, September 2, 1942, and September 4, 1942. All these requests for repatriation were made while Mr. Oehmichen was at Ellis Island and before he was sent to the internment camp in Texas. They were made before he experienced internment.

The record shows that at the internment camp the authorities provided a wide range of recreational activities, including movies twice a week, a huge swimming pool, baseball, tennis, and badminton. There was a thirty-bed hospital. Mrs. Oehmichen testified that the food supply was very good and very adequate —"Yes, very, definitely." Mrs. Oehmichen cooked for her husband. They were supplied certain items of furniture, and if they wanted anything else they could buy it. They had a radio and also

had their dog sent down from New York. Mrs. Oehmichen testified, in respect to the living conditions: "However, we would have put up with that, if we wouldn't have had the Nazi pressure in the camp."

In May, 1943, and January and February, 1944, they renewed their appeals for repatriation. On June 27, 1944, Mr. Oehmichen filed a letter, addressed to the Officer in Charge of the camp, advising him, "Should a review of my case result in a decision qualifying me for a parole, you are advised that I would not accept same." Thus he refused freedom in America. Surely that choice was not induced by difficulties in internment.

It is argued that under the rule of the Guessefeldt case[2] the Oehmichens were not possessed of the requisite intention to make them "resident within" Germany. We think that case does not apply here. Guessefeldt was visiting in Germany and was physically restrained from leaving it. The Court held that, being under such restraint and seeking at all times to return to the United States, he was not resident within Germany.

The Oehmichens were in Germany by their own free choice. The explanation that because of difficulties with pro-Nazis they were compelled to return to Nazi Germany is singularly unimpressive. As a legal matter we are of opinion that mere discontent with conditions in a well-run internment camp is not the compulsion which would translate otherwise voluntary repatriation into departure under duress. Internment is the established international treatment of resident enemy aliens by all civilized countries.[3] The Oehmichens chose to return to an enemy country rather than to undergo that established treatment.

If the argument of Mrs. Oehmichen were valid, all German citizens in the United States at the outbreak of the war could have returned promptly to Germany, exercising a wish not to be interned here, lived there until the war's end, and returned here to claim they had never been resident in Germany. Under her argument no German national residing in the United States prior to the war, and moving by choice to Germany during the war, would have become resident in Germany, as every such person was faced with the possibility of internment here. We think the statute reflects no intention to achieve such a result.

We do not have in this case anything resembling the facts depicted in such cases as Guessefeldt, supra, Acheson v. Murakami,[4] Kaku Nagano v. McGrath,[5] or Yaichiro Akata v. Brownell.[6] The Oehmichens were willing residents of Germany.

The judgment of the District Court must be reversed and the case remanded for entry of a judgment dismissing for lack of jurisdiction.

Reversed and remanded.

EDGERTON, Chief Judge (dissenting).

The question is: If aliens who have long been resident in the United States choose repatriation to an enemy country in preference to imprisonment in the United States during a war, and always intend to return to the United States as soon as the war is over, are they, within the meaning of the Trading with the Enemy Act, "resident" in the enemy country during their sojourn there? I think not.

The District Court made the following undisputed findings, among others. The requests for repatriation to Germany "were made solely to escape internment and the emotional problems created thereby" and "were clearly limited to repatriation during the time that intern-

2. Guessefeldt v. McGrath, 1952, 342 U.S. 308, 72 S.Ct. 338, 96 L.Ed. 342.

3. See full discussion in Johnson v. Eisentrager, 1950, 339 U.S. 763, 772 et seq., 70 S.Ct. 936, 94 L.Ed. 1255.

4. 9 Cir., 1949, 176 F.2d 953.

5. 7 Cir., 1951, 187 F.2d 759.

6. D.C.D.Hawaii, 1954, 125 F.Supp. 6.

ment was expected to last, i. e., the duration of the war. \* \* \* Plaintiff and her husband at all times intended to return to the United States after the end of hostilities". They retained "a fixed determination" to do so. Accordingly, "At no time while they were in Austria or Germany did plaintiff or her husband seek employment or engage in business except for plaintiff's husband's employment with the United States Army of Occupation. Plaintiff's husband was offered opportunities to engage in business in Germany which he did not accept. \* \* \* After plaintiff's furnishings were stored [here], both she and her husband, while in the United States and in Europe, refused offers to buy their automobile and certain household appliances at premium prices because they planned to use these possessions again upon their return to the United States."

It is true that Oehmichen's place of confinement when he first asked for repatriation was Ellis Island. But he and his wife did not choose to return to Germany in order to avoid Ellis Island. They knew that internment for him was in prospect. The court correctly states that they "chose to return to an enemy country rather than to undergo" internment. Their internment was legal and in accordance with international usage, but it was nonetheless imprisonment. Appellee and her husband never had "any doubt" that they were "in prison". No one similarly situated would have any doubt. The internment camp was surrounded by a "very high" barbed-wire fence, kept lighted at night. There were watchtowers and armed guards. The shelters had no plumbing. Water had to be carried in pails about a hundred feet. The bathhouses were about 500 feet away from the shelters. The fact that the food was good and there were recreation facilities did not turn the prison into something else.

In explanation of the fact that she and her husband once refused parole, appellee testified: "We felt that parole was like for any ordinary criminal. Mr. Oehmichen would have to report to a parole officer. And Mr. Oehmichen did not want to be in a waiting room with a criminal who might knock him on the shoulder and say: Buddy, how long have you been in? And that was the objection of Mr. Oehmichen to be released on parole. He did not feel he had done anything he needed to be paroled for. \* \* \* He wanted to be released without any ties attached to it. I mean, parole meant that he was paroled of some guilt, which he did not feel he had. There was no guilt. Q Am I correct in saying that he felt by applying for parole, it was acknowledgement of guilt? A That is right. Q And he felt he would be treated as any other criminal? A Any ordinary criminal. Q Now, did you share that feeling, Mrs. Oehmichen? A At the time, yes." When they learned that the conditions of parole would be less drastic than they had supposed, appellee requested her husband's release. Parole was then refused. When they left the United States, the alternative was not parole but continued imprisonment.

I do not reach appellee's other contention.