**SUMIYE UMEKI YAMAUCHI, Plaintiff**

v.

**William P. ROGERS, Attorney General of the United States, as Successor to the Alien Property Custodian, Defendant.**

Civ. A. No. 1415–58.

United States District Court
District of Columbia.

Feb. 10, 1960.

Louis L. Rochmes, Washington, D. C., for plaintiff.

Dallas S. Townsend, Asst. Atty. Gen., Director, Office of Alien Property, Arthur R. Schor and James H. Falloon, Department of Justice, Washington, D. C., for defendant.

WALSH, District Judge.

The above entitled cause is brought under Section 9 of the Trading with the Enemy Act [50 U.S.C.A.Appendix, § 1 et seq.]. Plaintiff seeks to recover the proceeds of an insurance policy issued in the name of her father, and seized by the Alien Property Custodian, and for which claim had been made by her father prior to his death.

The applicable sections of the Act are:

"§ 2. *Definitions.*

"The word 'enemy', as used herein, shall be deemed to mean, for the purposes of such trading and of this Act [sections 1–6 and 7–39 of this Appendix]—

"(a) Any individual * * * of any nationality, resident within the territory * * * of any nation with which the United States is at war * * *

"§ 9. *Claims to property * * * suits to recover.*

"(a) Any person not an enemy or ally of enemy claiming any interest, right, or title in any money or other property which may have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian or seized by him * * * if the claimant shall have filed the notice * * * may institute a suit * * * to establish the interest, right, title, or debt so claimed * * *"

The case was heard on December 11, 1959. Each party filed trial memorandum, documentary evidence was intro-duced, and argument was had by counsel. The case was taken under advisement, and counsel directed to submit proposed findings.

Counsel for plaintiff argues that decedent, Kunishige Umeki, the father of plaintiff, was a resident of the United States within the meaning of the Act, from 1906 until his death in 1956; that his presence in Japan from 1946 to 1952 did not constitute residence for the purposes of the Act; and that by reason of the circumstances under which repatriation forms were executed, decedent's repatriation was not a voluntary act, and was not a voluntary abandonment of his United States residence.

Counsel for plaintiff asks the Court to take notice of the fact that following the surrender of Japan in August, 1945, the United States desired to close the internment centers and to release internees; that communities on the West Coast of the United States were then still hostile to released internees, and many were unable to return to their former communities; that the atmosphere of the internment centers was that of a penitentiary and internees were badly treated and forced to live in crowded conditions with inadequate sanitary facilities; and that repatriation forms were signed by decedent and others under these conditions.

Defendant argues that plaintiff cannot recover by reason that her predecessor in interest was an enemy of the United States within the meaning of the Act, in that he was a resident within a nation with which the United States was at war, and therefore her predecessor in interest could not recover.

Upon consideration of the pleadings, briefs, evidence and argument of counsel, the Court makes the following findings of fact and conclusions of law:

1. The Court has jurisdiction of the subject matter and the parties in this action.

2. Plaintiff, Sumiye Umeki Yamauchi, is a natural born citizen of the United States, a resident of California, and

the daughter and sole heir of the decedent, Kunishige Umeki, who died intestate in December of 1956.

3. Decedent, Kunishige Umeki, was a Japanese national, who entered the United States in 1906, at 18 years of age, and became a resident of California; married a Japanese national, and had two children, both of whom were born in California; and decedent maintained his residence in California continuously until 1942.

4. The insurance policy in question was issued to decedent in 1929, was a 20-Year endowment policy, No. W3-128129, California-Western States Life Insurance Company, maturing in November of 1949, with a face value of $3,000.

5. The net proceeds of said policy totaled $3,366.75.

6. Early in 1942, the United States being then at war with Japan, decedent and his family were evacuated by the Government and interned at a War Relocation Center, along with other persons of Japanese descent, and decedent and his family remained at said Center until late in 1945.

7. The internment of decedent and his family was due solely to the fact that they were of Japanese descent, and he was not charged with any unfriendly, subversive or hostile acts, and there is no evidence of decedent or plaintiff ever having performed any act hostile to or against the interests of the United States.

8. In August of 1945, Japan surrendered to the United States, and articles of surrender were signed in September of 1945.

9. On October 29, 1945, decedent, Umeki, while still at the Relocation Center, signed a printed form of the United States Immigration and Naturalization Service, entitled "Application for Repatriation" and indicated his desire to be repatriated to Japan only if named members of his family accompanied him. [The named individuals included his wife and two children, both minors, and other relatives.]

10. On November 26, 1945, decedent signed another application for repatriation, indicating his desire to go to Japan to live, and requesting the United States to send him there.

11. Decedent, with his wife and two minor children, including the plaintiff who was then fifteen years of age, left the United States in December of 1945 and arrived in Japan early in January of 1946, and lived on his mother's farm. Upon the death of decedent's mother, he inherited the farm, and continued to work the farm and did not engage in any other employment or business.

12. As of December 31, 1946, cessation of hostilities with Japan was proclaimed by the President of the United States (proclamation No. 2714), 50 U.S. C.A.Appendix, § 601 note.

13. In 1949, Masuao Umeki, son of decedent and the brother of plaintiff, and a citizen of the United States, died in Japan.

14. In 1950, the Office of the Alien Property Custodian issued an order (15068) in which decedent, Kunishige Umeki, was declared "a resident of Japan and a national of a designated enemy country (Japan)", and said order vested the proceeds due or to become due under the insurance policy.

15. In April of 1951, the decedent executed, before the United States Vice Consul in Japan, a proper notice of claim for return of the property, and filed it with the Office of the Alien Property Custodian on May 21, 1951.

16. Decedent, with his wife and daughter, returned to the United States in December of 1952.

17. In September, 1955, Tane Umeki, the wife of decedent and mother of plaintiff, died a resident of California.

18. In December of 1956, Kunishige Umeki, died a resident of California.

19. The Treaty with Japan, dated September 8, 1951, was ratified by the United States Senate on March 20, 1952, and came into force on April 28, 1952.

20. Occupation of Japan by United States Troops began shortly after the

surrender and continued until the Treaty was ratified.

21. The Director, Office of Alien Property, denied the Umeki claim for return of the vested property on May 27, 1957, and the defendant continues to hold the proceeds of the insurance policy in the amount of $3,366.75.

There is no controversy as to any of the above Findings of Fact, Numbered 1 through 21, inclusive.

As noted earlier, the property of the decedent which was seized consisted of an endowment insurance policy, the face value of which was $3,000. This was reduced to $2,699 on May 2, 1947, because of a lapse in the payment of premiums.

No one questions the right or the authority of the President, through the Alien Property Custodian, to seize property in time of war. However, as noted in the case of Kaku Nagano v. McGrath, 7 Cir., 187 F.2d 759, 765, the administrative policy of the Executive is not to keep from loyal residents, whether alien or citizen, non-enemy property which is rightfully in America, has served no enemy purpose and has threatened to serve none. The Court in the Nagano case stated with respect to this policy:

> "Such was the administrative policy expressed by the Custodian in his presentation to the Congressional Committee, where he said that on occasion he had found it necessary to vest property which he later discovered he was not entitled to keep. He proceeded thus, he reported, because he considered it necessary to resolve all questions of jeopardy against the United States in favor of the government; * * * As said in Lamar v. Browne, 92 U.S. 187, 196 23 L.Ed. 650, * * * the custodian must act upon appearances. It is his official duty to seize and hold, leaving to the owners to make good their claim as against the capture,

in the appropriate tribunal established for the purpose."

Defendant cites numerous cases in support of the contention that plaintiff herein is unable to maintain the present action for the reason that plaintiff's predecessor in interest was not eligible to maintain an action to recover property vested under the Trading with the Enemy Act. In none of the cases cited by defendant are the circumstances similar to those of the present case.

Decedent, Kunishige Umeki, made his request for repatriation while at the Tule Lake Center following the cessation of hostilities and the surrender of Japan. At that time the United States Government, through the War Relocation Authority, began to close the relocation centers, and offered to Japanese nationals the choice of returning to their former communities or to other communities within the United States, or of returning to their native land.

In Acheson v. Murakami, 9 Cir., 176 F.2d 953, appellees had renounced their United States citizenship while at the Tule Lake Center, and later sought restoration of their citizenship. The District Court entered judgment cancelling the renunciations and adjudging that the plaintiffs be restored to their full rights as citizens, and the Secretary of State was ordered to issue passports. The circuit court affirmed. The District Court found that the renunciations of citizenship "were 'not as a result of their free and intelligent choice but rather because of mental fear, intimidation and coercions depriving them of the free exercise of their will, [and] said purported renunciations are void and of no force or effect'." The District Court made extensive findings as to the conditions of the internment and incarceration at the Tule Lake Center which were adopted by the appellate court, including the reasons for fear of reprisals if persons of Japanese descent were to return, at that time, to communities in the United States.[1]

---

1. It should be noted in the case of Ex parte Endo, 1944, 323 U.S. 283, 65 S.Ct. 208, 214, 89 L.Ed. 243, that the Supreme

Court in reviewing the program of the War Relocation Authority found, among other things: (1) that Relocation Cen-

The appellate court in its rather lengthy decision discusses "these uncontested underlying facts, certain to have their effect upon the minds of the mass of deportees incarcerated at Tule Lake."

The District Court of Hawaii in Yaichiro Akata v. Brownell, D.C., 125 F. Supp. 6, 8, stated:

"A careful search of the reported cases has been fruitless with respect to the return of an alien to his native land *after* the cessation of hostilities between the warring nations and the subsequent vesting of his property located in the United States on the ground that he was a resident of his native land and a national of a designated enemy country. Nor has any case been found setting forth circumstances similar to those in this case, where the claimed abandonment of a permanent residence was set into motion (however justified) by the nation which now seeks to retain the property it seized from the alien whose place of residence is now questioned.

\*     \*     \*     \*     \*     \*

"It is the court's opinion that the involuntary nature of Akata's departure from his settled and permanent place of abode in Honolulu on September 21, 1942, infected whatever actions he took thereafter. A necessary factor in the change of domicile, or even something less than domicile, is a free and dispassionate decision to abandon that which has meant security, offered opportunity and happiness, and has been a 'home' in the fullest sense that we in America like to understand that familiar word. Through no apparent fault of his own, Akata was denied the privilege of making that decision in such a manner. The basic urge to gather one's family together and to keep it intact could very well be in normal circumstances, and often is, the reason for change of domicile. However, in order to effect the change, there must be a voluntary abandonment of a settled and permanent place of abode coupled with the acquisition of a new domicile freely and voluntarily assumed. At what point can it be said Akata voluntarily and freely decided to abandon his domicile in Honolulu?"

The Court held that Akata's "physical presence in Japan from December 1945 until December 1952 under the circumstances as disclosed by the evidence in this case did not make him a 'resident within' enemy territory within the meaning of Section 2 of the Trading with the Enemy Act" and, therefore, Akata was not an enemy of the United States and was entitled to recover.

It is interesting to note that plaintiff Akata was interned in 1942 and eventually sent to the Tule Lake Center, in 1945 he returned to Japan, and his property was vested in 1947.

In Brownell v. Oehmichen, 100 U.S. App.D.C. 214, 243 F.2d 637, 639, certiorari denied 355 U.S. 842, 78 S.Ct. 49, 2 L.Ed.2d 50, cited by defendant, plaintiff and her husband had originally requested repatriation in 1942, prior to internment.[2] Subsequent requests were made and they were permitted to return to Germany in 1945.

In Nagano v. McGrath, supra, plaintiff, Nagano, a resident of the United States, had lived in Japan for 29 years while educating her daughters and obtaining husbands for them in accordance with Japanese customs. Her husband was a permanent resident of the United

ters were maintained as "interim" residences for evacuees; and (2) that, where applications for indefinite leave were received from persons detained at relocation centers, before a leave was granted a relocation officer had to investigate and approve "public sentiment at his proposed destination."

2. The Court in the Oehmichen case distinguished the Akata case, supra, and stated "We do not have in this case anything resembling the facts depicted in such cases as \* \* \* Akata v. Brownell."

States. Following the outbreak of the war with Japan the stock belonging to plaintiff was seized. The District Court granted a dismissal of plaintiff's suit to recover for the reason that plaintiff was an "enemy" under Section 2, and "resident within" the territory of an enemy nation under Section 9 of the Act, and was therefore barred from bringing the action. The appellate court, on reversing, stated:

> "Residence being mostly a matter of intention, from the facts averred, it is clear that plaintiff never intended to change her established Chicago residence. * * * Permanent residence does not arise out of transitory abode or out of a temporary sojourn in a place other than that of residence",

and held that plaintiff was never within the definition of an enemy and a "resident within enemy territory." The court then discussed other sections of the Act, and particularly the enactment of an amendment which added Section 39 in 1948, and the Court said:

> "* * * We think the legislation such and the Congressional history such that it is evident that Congress was not proposing to deprive friendly alien residents of all opportunity to recover untainted American property,—a right recognized for some twenty-five years by express legislation. To impute such an intent to the Congress would result in a conclusion that it intended to deprive resident owners of innocent private property, untainted by enmity, without due process of law."

It is doubtful whether Congress intended property of the sort, and under the circumstances, as recited in the instant case, to be seized and thus withheld from individuals such as the plaintiff.

The instant case is not a case of first impression in this Circuit so to what constitutes a "resident within the territory" for purposes of the Trading with the Enemy Act. The Court of Appeals was faced with this question in the case of McGrath v. Zander, 85 U.S.App.D.C. 334, 177 F.2d 649, 652. The Court there stated:

> "We recur then to the decisive question. Was appellee 'resident within' Germany? If so, she became an enemy under Section 9(a) and would not be entitled to recover. The crucial term 'resident within' has been interpreted in [citations] and Sarthou v. Clark, D.C.S.D.Cal. 1948, 78 F.Supp. 139, 142."

The Court then went on to quote with approval from the Sarthou case, supra, to the effect that the opinion there epitomized the several rulings on the matter where it stated:

> "* * * 'resident within the territory' as employed in the Act connotes something different from and more than living within the specified areas. It is rather indicative of a settled and permanent place of abode, volitionally acquired and voluntarily assumed."

■ The important factors employed by the Court of Appeals in the definition it adopted of "resident within the territory", which appear to be lacking in this case, are a "volitionally acquired and voluntarily assumed" place of abode in enemy territory.

Here, as in the Akata case, supra, there was an involuntary element in the decedent's "departure from his settled and permanent place of abode" in the United States in the early part of 1942, that infected whatever actions he took thereafter.

Volition, meanwhile, is defined in Webster's New International Dictionary, 2nd Ed., 1939, as an "act of willing or choosing". This Court finds, in the case here before it, as did the court in the case of Acheson v. Murakami, supra, with respect to renunciations of citizenship by United States citizens of Japanese descent, that the decedent's places of abode from early 1942 until his return to the United States in December, 1952, were not volitionally acquired, because, as set

forth earlier, they were not acquired as a result of free and intelligent choice but rather were acquired because, in the case of abode in Japan from early 1946 to 1952, of mental fear and intimidation, which deprived him of the exercise of his free will.

The Government has itself on occasion, as noted earlier, taken the position that the residency of the persons detained at the relocation centers was an "interim residency" and that apparently the Government feared for the safety of persons of Japanese descent in certain localities, when they were permitted to go on leave, for the "public sentiment" in the area was investigated prior to such leave. If the relocation center was an interim residence, then presumably the permanent residence of an individual while so detained must have been his place of abode prior to his detainment. Also, since the Government recognized the danger inherent in permitting a person of Japanese descent to return to an area on leave where public sentiment was unfavorable and thus the authorities might refuse a request for leave on such grounds, this Court is of the opinion that the decedent in this case could take this factor into consideration, and that in so doing, it would affect his exercise of free will. The Government, here, having set in motion a disruption of the decedent from his voluntarily assumed and volitionally acquired residence, precipitated a chain of events, that were infected by the Government's acts, which did not amount to an abandonment of the decedent's United States permanent residence at any time.

■ The defendant here states that the plaintiff must prove that both she and her decedent were not enemies, or allies of an enemy of the United States during the state of war. Since the decedent here was found not to have abandoned his United States residency and since the residency of the child usually follows that of the parents, the plaintiff is not considered an enemy. In addition, the plaintiff here is a natural born citizen, who followed her parents to Japan as an infant, and returned shortly after reaching her majority. All the foregoing considerations militate against a holding that the plaintiff abandoned her residence in the United States.

In view of the foregoing considerations, this Court considers that it would be error to keep from the plaintiff the innocent private property, untainted by enmity, of which she is the sole and rightful heir.

### Further Findings of Fact

22. The Court finds that the decedent, Kunishige Umeki, made his request for repatriation in October, 1945, at the time and under the circumstances set forth in Acheson v. Murakami, supra.

23. The Court finds that decedent, Kunishige Umeki, did not voluntarily and volitionally abandon his residence in the United States.

24. The Court finds that decedent did not voluntarily and volitionally request repatriation to Japan.

25. The Court finds that the insurance policy in question was "innocent private property, untainted by enmity", and the proceeds thereof were vested after the decedent returned to Japan and following cessation of hostilities.

26. The Court finds that neither the decedent, Kunishige Umeki, nor the plaintiff, Sumiye Umeki Yamauchi, was an "enemy" and was not a voluntary "resident within enemy territory" within the meaning of Sections 2 and 9 of the Trading with the Enemy Act.

### Conclusions of Law

1. Plaintiff's decedent had a right to recover the vested property.

2. Plaintiff, deriving her claim from such decedent, has a right to recover.

Accordingly, upon presentation of a proper order, judgment will be entered for plaintiff, and against defendant, directing the return of the vested property.